UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN BOHNE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C. A. NO.  04CV10068WGY |
| | ) |
| COMPUTER ASSOCIATES INTERNATIONAL, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT COMPUTER ASSOCIATES INTERNATIONAL, INC.'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

Plaintiff John Bohne ("Bohne") worked for defendant Computer Associates International, Inc. ("CA" or "the Company") in a variety of sales and sales management capacities for many years.  Notwithstanding his years of experience with CA, in March 2002, he negotiated a deal on behalf of the Company in which he agreed that CA would assume more than $227,000.00 in payments that a customer owed to a third party, but failed to disclose this significant financial term to CA.  After finding out about this conduct, CA terminated Bohne's employment. Refusing to acknowledge that his failure in this regard led to his termination, Bohne asserts that CA's decision to terminate his employment was motivated by age discrimination and/or in response to alleged whistle blowing activities.  Bohne also claims that CA breached the covenant of good faith and fair dealing by failing to pay him certain commissions on transactions that date as far back as 1992.

CA is entitled to summary judgment on these claims.  Bohne's discrimination claim fails because he cannot establish a *prima facie* case; he simply was not performing his job to CA's

legitimate expectations.  Further, CA has articulated a legitimate business reason for his

termination and Bohne has no evidence that this reason was false, much less that it was a pretext

for discrimination.  Bohne's statutory whistle blower claim fails because Mass. Gen. Laws.

c.149, § 185(a)(2) does not apply to private sector employees.  His analogous common law claim

for termination in violation of public policy is deficient because no public policy is implicated in

this case and Bohne's conduct did not constitute whistle blowing in any event.  Finally, Bohne's

claim for breach of the covenant of good faith and fair dealing is not viable because there is no

evidence that CA terminated his employment in bad faith to deprive him of compensation he had

already earned.  To the contrary, CA terminated Bohne's employment because of his clear

misconduct.

## STATEMENT OF FACTS[1]

**A.**    **Background**

CA, one of the world's largest computer software companies, employs a sales force of

Sales Executives who market and sell licenses to CA's software products and related

professional services to companies throughout the United States and abroad.  (SF ¶1; Affidavit of

Alexander Arato ("Arato Aff."), ¶2.[2])  Bohne was employed with CA in various sales or sales

management capacities from February 14, 1983 until August 19, 2002.  (SF ¶2; Deposition of

John Bohne ("Bohne Dep."), 13-15.)  At the time of his termination, Bohne, who was age 59,

was a Sales Executive in CA's Framingham office.  (SF ¶¶2, 43; Bohne Dep., 15, 36.)

---

[1] For a more complete statement of facts, CA refers the Court to its Statement of Undisputed Facts
("SF"), submitted pursuant to Local Civil Rule 56.1.

[2] All affidavits are hereafter cited by using the affiant's last name followed by "Aff."  Copies of all
affidavits, deposition transcript excerpts and documents cited herein are included in the Appendix of
Exhibits.

During Bohne's employment, CA required Sales Executives to draft and obtain approval of a Business Analysis Review Form (known at CA as the "BARF") and related documents including an Order Form and Addendum (hereafter these documents are referred to jointly as the "BARF"), which contain the proposed terms of the deal including the products to be sold, the price of those products, the proposed payment terms, and projected CA expenditures. (SF ¶¶5, 6; Pilato Aff., ¶¶2, 4; Bohne Dep., 21-23, 40; Exhibit (Exh.") 4, at CA 1288.) A CA sales executive was not permitted to make a formal sales proposal to a customer or potential customer until CA's Global Sales Operations ("GSO") approved the BARF for the proposed deal. (SF ¶5; Pilato Aff., ¶¶2, 4.) To determine whether a proposed deal complied with CA's internal licensing policies, the Sales Executive had to provide GSO with clear and accurate information on the BARF outlining all aspects of the deal.[3] (SF ¶¶5, 7, 9; Pilato Aff., ¶¶2, 4.)

## B.   The Allmerica Deal

In connection with a proposed deal with First Allmerica Financial ("Allmerica") in March 2002 (the "Allmerica Deal" or "March 2002 Deal"), Bohne submitted several versions of the BARF to Jennifer Pilato, the GSO Business Manager for his region. (SF ¶¶10-13; Pilato Aff., ¶¶2, 5.) According to the final BARF Bohne submitted on March 25, 2002, and which was ultimately approved, the Allmerica Deal was worth approximately $1.8 million to be paid to CA in three installments over three years. In August 2002, however, CA learned for the first time that the Allmerica Deal was actually worth substantially less. What Bohne had failed to disclose on the BARF was that, as part of the deal, he had obligated CA to make Allmerica's payments, totaling $227,048.00, to a third party financer, on two of the licensed products, Netmaster and

---

[3] On the BARF, Sales Executives had to take into account and disclose any terms – such as an agreement by CA to either assume payments owed to a third party on behalf of a customer or to forgive payments owed by a customer to CA – that would decrease the net value of a deal. (SF ¶9; Bohne Dep., 40; Pilato Aff., ¶¶2, 4; Exh. 4, at CA 1288.)

AION.[4]  (SF ¶¶8, 14, 15, 18-26, 44-48; Schultz  Aff., ¶2, 4, 7, 19; Pilato Aff., ¶5; Exh. 10; Exh. 11; Exh. 12, at CA 1038, 1054.)

Bohne's conduct came to light in August 2002, when Allmerica complained about CA's failure to make one of these payments.  (SF ¶23; Bohne Dep., 168.)  Bohne brought the issue to the attention of Jean Schultz, Pilato's then Manager, who happened to be in the Framingham office that day.  (SF ¶¶24-25; Bohne Dep., 168; Shultz Aff., ¶¶1-2.)  He told Schultz that the payment "was supposed to have been included as part of the deal for Allmerica and that the client should not be obligated to pay that $94,000."  (SF ¶25; Bohne Dep., 168-69.)  Schultz responded, "well, we probably didn't know about it."  (SF ¶26; Bohne Dep., 170.)  According to Bohne, he returned to his desk, reviewed the Allmerica BARF and subsequently showed or described to Schultz three places in the BARF where he supposedly disclosed this financial term of the deal.  (SF ¶26; Bohne Dep., 170-72.)

Shortly after this interchange, Bohne accessed CA's commission system and found that CA had paid commissions to another Sales Executive, who he assumed to be Tom Alessi, a Sales Executive also assigned to the Allmerica account, on part of the deal.[5]  (SF ¶27; Bohne Dep., 172-73; 262-63.)  Bohne contacted  Schultz by phone and left her a voicemail message in which he told her:  ". . . I did not want to be 'dinged' for the Aion piece of this deal when it got backed

---

[4] Allmerica had originally licensed these products from Platinum Technology Inc. ("Platinum"), a company that CA had subsequently acquired.  Because Allmerica had financed these licenses through a third party, and the third party paid Platinum in full for the licenses up front, the remaining two payments on each license were owed to the third party financer, not to CA. (SF ¶18; Bohne Dep., 145.)  CA's database, known as TOPS, did not reflect that Allmerica owed this money on these products because it did not owe money to CA.  (SF ¶18; Schultz Aff., ¶3.)

[5] According to Bohne, CA classified that portion of the deal on which it commissioned Alessi as "new product".  He theorizes that CA would have done so because Wall Street analysts view new product sales more favorably than other types of transactions.  (SF ¶50; Bohne Dep., 51-52; 175-76.)  The undisputed facts establish that CA did not treat any portion of the deal as new product.  (SF ¶¶51-52; Exh. 14 at CA 1233; Exh. 15 at CA 1267.)

out because I was never paid on it."  (SF ¶28; Bohne Dep., 174.)  In other words, Bohne did not

believe that his commissions should be adjusted downward to reflect the decreased actual net

value of the Allmerica Deal because he did not believe he had been commissioned for one of the

products that gave rise to the newly disclosed payment obligations.[6]  (SF ¶¶28-29; Bohne Dep.,

173-74.)

## C.    Bohne's Termination

After Bohne advised Schultz about this issue and disclosed that both he and Allmerica

had intended CA to assume Allmerica's payments on the AION and Netmaster products, Schultz

reviewed the BARF Bohne had submitted to GSO.  She determined that he had never indicated

that CA would be assuming any of the payments Allmerica owed to a third party financer.  (SF

¶¶30-31; Schultz Aff., ¶¶5, 7, 11-12.)  Bohne had included a single, confusing and, at best,

ambiguous statement in a box entitled "Business Description" on Tab B of the BARF:

> The Client currently has a CPU licenses [sic] and wishes to go to a MIPS based
> License.  The Pre-commeted [sic] payment for Endevor and Intertest will survive
> the agreement.  The BAU[7] includes the Precommited Payment for Netmaster and
> Aion.  Since those terms are less than 3 years and they will upgraded as a result of
> this transaction, [sic]"

(SF ¶31; Schultz Aff., ¶5; Exhibit 12, at CA 1059; see also Exh. 10.)  His single sentence about

the "pre-committed" payments was ambiguous because he did not make it clear that he intended

that CA would assume responsibility for the "pre-committed" payments.  (SF ¶32; Schultz Aff.,

¶¶5-6.)  More importantly, none of the spreadsheets that Bohne submitted with the BARF took

into account this financial term of the proposed deal.  In particular, on a spreadsheet called

"Allmerica Financial Three Year Financial Projection," which showed the alleged total value of

---

[6] The undisputed facts also establish that CA paid Bohne commission on the portion of the deal that
included the AION product.  (SF ¶¶54-55; Exh. 14; Exh. 12 at CA 1048, 1052, 1054.)

[7] BAU means business as usual.

the various components of the deal and the payment stream to CA, Bohne did not state that CA would be assuming any, much less all, of the payments owed by Allmerica to a third party. Nonetheless, the total of the payment stream corresponded to the $1.8 million value of the deal. (SF ¶¶33, 45-48; Schultz Aff., ¶¶7, 11; Exh. 12, at CA 1060-68.)  Further, neither the Order Form nor Addendum included a provision that provided for CA's assumption of these payment obligations.  (SF ¶¶20-21; Schultz Aff., ¶¶7, 11; Exh. 12, at CA 1079-87.)

Because Bohne failed to account for the substantial payments that he had obligated CA to make on Allmerica's behalf, CA initially recognized greater revenue and paid higher commissions on the Allmerica Deal than it should have.  (SF ¶34; Schultz Aff., ¶8.) Understanding that CA would need to take steps to address what had occurred, Schultz reported Bohne's conduct to GSO Business Manager Peter Bordonaro, who, on Saturday August 17, 2002, reported it to Alexander Arato, an attorney in CA's legal department.  (SF ¶¶34-35; Schultz Aff., ¶¶8-9; Exh. 13; Arato Aff., ¶6.)

Shortly before CA found out about Bohne's mishandling of the Allmerica Deal, CA had completed an investigation into very serious misconduct by members of the Framingham office sales team that involved falsifying documents relating to CA deals in order to improperly inflate the commissions they received from CA.  As a result of this misconduct, CA terminated the employment of multiple sales and sales management employees.  Arato was involved in the investigation of the Framingham office.   (SF ¶36; Arato Aff., ¶7.)

On the next business day after Arato learned about Bohne's alleged conduct, CA was scheduled to hold an event for the remaining Framingham staff, attended by CA's then Chief Executive Officer, Sanjay Kumar, and then Senior Vice President, Worldwide Head of Sales, Stephen Richards, that was intended to signify the end of the formal internal investigation of the

Framingham office. (SF ¶37; Arato Aff., ¶8.)  Given what had occurred in Framingham and the

upcoming event, Arato immediately advised Kumar and Richards of Bohne's alleged conduct.

(SF ¶38; Arato Aff., ¶9.)  Richards directed Arato to review the BARF Bohne submitted and

determine whether he had properly accounted for the payment to the third party finance company

in his financial calculations of the Allmerica Deal's net value to CA.  Richards told Arato that

CA would terminate Bohne's employment if he did not properly disclose this obligation, but that

if Bohne had disclosed this obligation on the BARF, and CA's staff had missed it for some

reason, CA should not terminate his employment.  (SF ¶39; Arato Aff., ¶10.)

Arato reviewed the BARF along with Bordonaro and found that in the Financial

Projections spreadsheet in which Bohne calculated the value of the Allmerica Deal, Bohne had

failed to account for CA's assumption of the payments to the third party finance company.  (SF

¶40; Arato Aff., ¶11.)  As a result, pursuant to Richards's instructions, CA terminated Bohne's

employment.  CA carried this decision out quickly because it was important to do so before the

Framingham event commenced on August 19, 2002.  (SF ¶¶41, 42; Arato Aff., ¶12.)

## LEGAL ARGUMENT

**I.    BOHNE CANNOT ESTABLISH A *PRIMA FACIE* CASE OF AGE
        DISCRIMINATION.**

To establish a *prima facie* case of age discrimination under state or federal law, Bohne

must demonstrate that: (1) he is at least forty years of age; (2) his job performance was sufficient

to meet CA's legitimate expectations; (3) CA terminated his employment; and (4) CA replaced

him with a similarly or less qualified person who is substantially younger.[8]  Baralt v. Nationwide

---

[8] The elements of a *prima facie* case of age discrimination are identical under federal and state law, with the exception that, pursuant to M.G.L. c. 151B, in order to satisfy the fourth element, a plaintiff must demonstrate that he or she was replaced by someone who is no less than 5 years younger than the plaintiff.  See Knight v. Avon Prods., Inc., 438 Mass. 413, 424 (2003).

Mut. Ins. Co., 251 F.3d 10, 16 (1st Cir. 2001); Hillstrom v. Best Western TLC Hotel, 265 F.

Supp. 2d 117 (D. Mass. 2003). A claim of age discrimination fails at the preliminary stage

where, as here, the plaintiff cannot demonstrate that his job performance met his employer's

legitimate expectations. Hillstrom, 265 F. Supp. 2d at 125.

The undisputed facts establish that Bohne's conduct in misrepresenting the financial

terms of the Allmerica Deal in March 2002 rendered his performance unsatisfactory to CA. As

discussed above, Bohne utterly failed to articulate in the BARF that he submitted to CA that he

intended for CA to assume responsibility for $227,048.00 in payments that Allmerica owed to a

third party, thereby inflating the net value of this deal. As a result, CA initially recognized

greater revenue, and paid larger commissions, on the deal than it should have. Bohne himself

concedes that it was his responsibility as a Sales Executive to provide CA with the financial

information about a deal he proposed. (SF ¶¶5, 6, 9, 21-22; Bohne Dep., 76.) Given his failure

to do so, it is clear that his performance failed to meet CA's legitimate expectations.

Bohne will likely argue that he provided CA with the information it needed to understand

his proposal and that, therefore, his performance was satisfactory. Bohne's opinion in this regard

is not relevant. It is well-established that "courts may not sit as super personnel departments,

assessing the merits—or even the rationality—of an employer's nondiscriminatory business

decisions." Heard v. Commonwealth of Mass., 2003 U.S. Dist. LEXIS 14233, 19 (D. Mass.

2003) (quoting Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991)). Thus, "relief

will not be granted to a plaintiff who has been discharged unfairly, even by the most irrational of

managers, unless the facts and circumstances indicate that discriminatory animus was the reason

for the decision." Cornwell v. Dairy Farmers of America, Inc., 2005 U.S. Dist. LEXIS 7922,

*48 (D. Mass. 2005) (quoting Ruiz v. Posadas de San Juan Assoc., 124 F.3d 243, 250 (1st Cir.

1997)).  Accordingly, the relevant inquiry is whether CA had a basis for concluding that Bohne,

an experienced CA Sales Executive, had failed to take the steps necessary to articulate clearly

and accurately the financial terms of the deal he proposed.  Given the ambiguity in Bohne's

written description of the term at issue and his failure to account for this term financially when

calculating the net value of the deal to CA, it is clear that CA was justified in terminating

Bohne's employment.  Moreover, CA's swift response to Bohne's conduct is particularly

understandable when placed in the context of surrounding events in the Framingham office and

CA's concern that it take prompt and appropriate action before the August 19 event with Sanjay

Kumar and Stephen Richards.  Given these factual circumstances, Bohne cannot establish a

prima facie case of discrimination.

## II.    EVEN IF BOHNE ESTABLISHES A *PRIMA FACIE* CASE OF AGE DISCRIMINATION, HIS CLAIM FAILS BECAUSE HE CANNOT ESTABLISH THAT CA'S ARTICULATED, NON-DISCRIMINATORY REASON FOR HIS DISCHARGE WAS A PRETEXT FOR AGE DISCRIMINATION.

Even assuming that Bohne could establish a *prima facie* case of age discrimination, CA

has rebutted any presumption of discrimination by articulating, through credible evidence, a

legitimate, non-discriminatory reason for Bohne's termination.  See Abramian v. Presidents &

Fellows of Harvard College, 432 Mass. 107, 116-17 (2000).  Accordingly, Bohne must

demonstrate that this articulated reason was not, in fact, the real reason for his termination, and

that CA was motivated by age animus.  See Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 15

(1st Cir. 1998); Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997).  As

described in greater detail above, CA terminated Bohne's employment because of his improper

handling of the Allmerica Deal.  Bohne cannot present evidence of any discriminatory animus

toward him on the part of anyone at CA, much less anyone involved in the decision to terminate

his employment.

Bohne must do more than simply cast doubt on CA's justification for firing him. Lawrence v. Northrop Corp., 980 F.2d 66, 69 (1st Cir. 1992). Bohne must present admissible evidence that would permit the inference that it was more likely than not that the articulated reason was a pretext for age discrimination. Shorette, 155 F.3d at 15; Matthews, 426 Mass. at 128. The only relevant inquiry is whether CA's articulated reason was truly held. See Shorette, 155 F.3d at 13 (Court focuses on "whether the employer believed that its proffered reason was credible"). Bohne fails to produce any evidence that CA did not believe its articulated reason for his termination.

Indeed, while Bohne may disagree with CA's reasoning or believe the ultimate decision was too harsh, his opinion is irrelevant and insufficient to proceed beyond this stage. See, e.g., Shorette, 155 F.3d at 15 (plaintiff's opinion regarding his job qualifications not sufficiently probative on issue of pretext). Even where "[t]he reasons for a decision [appear] unsound or even absurd, and the action [appears] arbitrary or unwise," an employer is justified in terminating an at will employee so long as the termination was not based on discriminatory animus. Matthews, 426 Mass. at 128 (internal quotations omitted); Bruce v. Wellesley, 47 Mass. App. Ct. 800, 806 (1999) ("'The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext.'") (quoting Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. 443, 448 (1996)); Mesnick, 950 F.2d at 825 (Courts may not sit as "super personnel departments").

Bohne cannot produce any evidence that CA's reason for terminating him was false. The undisputed facts provide no basis for inferring that CA terminated Bohne's employment for any other reason than his mis-handling of the Allmerica Deal which caused CA initially to recognize more revenue and pay greater commissions on the deal that it should have. Given that Bohne

was CA's source for the information necessary to determine whether the deal satisfied its

licensing policies, whether the discount given was appropriate and, in the end, whether CA

should enter into the transaction, Bohne's failure to provide complete, clear and accurate

information about the Allmerica Deal was a substantial error that justified his termination.

Moreover, the fact that CA reached this decision expeditiously does not undercut this fact.  The

extraordinary circumstances in Framingham warranted CA's swift response to Bohne's conduct.

Further undercutting Bohne's claim is the utter absence of any evidence of discriminatory

animus against Bohne in the decision-making process.  Bohne cannot demonstrate any age-based

animus, such as discriminatory remarks or epithets by the decision makers.  While Bohne

contends that his direct managers at CA discriminated against him, none of the individuals about

whom he complains was even involved in the decision to terminate his employment.[9]  Moreover,

Bohne's unfounded, generic assertion that CA, as a company, discriminated against older

employees is not evidence in the first place and cannot save this claim because he offers no

support his conclusory allegations.  In demonstrating pretext, "conclusory assertions or mere

allegations, in lieu of documented facts, cannot withstand a summary judgment motion."  Clinton

v. Beverly Enterprises-Massachusetts, Inc., 1998 WL 1182244, **4 (Mass. Super. Ct. 1998)

(citing Mercado-Gracia v. Ponce Federal Bank, 979 F.2d 890 (1st Cir. 1992)).  More importantly,

---

[9] At his deposition, Bohne testified that virtually every supervisor he had had over the last 15 years of his
employment had discriminated against him.  The testimony fails to save Bohne's discrimination claim for
several reasons.  First, review of his testimony reveals that other than the fact that he is over the age of 40,
he cannot point to any evidence that the conduct he complains of was based on age.  Even more
importantly, there is no evidence that the managers about whom he complains were involved in the
decision to terminate his employment.  (SF ¶¶73-75, 77-80; Bohne Dep., 181-219 ; Arato Aff., ¶7.)

other than the simple fact that he was 59 at the time, Bohne offers no evidence that suggests that the decision making process in his termination was tainted by discriminatory animus.[10]

Accordingly, because Bohne cannot prove that CA's legitimate reason for his discharge was untrue or motivated by an age-based animus, his age discrimination claim fails.

**III.    BOHNE'S CONDUCT DOES NOT CONSTITUTE WHISTLE BLOWING.**

**A.    CA'S Termination of Bohne's Employment did not Violate Public Policy.**

Bohne's claim that CA wrongfully terminated his employment in violation of public policy fails because his conduct does not amount to whistle blowing and he cannot establish that a public policy was implicated when CA terminated his employment.  Bohne points to two instances in which he allegedly "blew the whistle" with respect to the Allmerica Deal:  (1) he informed Jean Schultz that the third-party financer needed to be paid because CA had agreed to assume this payment obligation on Allmerica's behalf, and (2) he left a voicemail message for Schultz stating that he did not want to be "dinged" – i.e., have any downward adjustment made – on commissions that he did not receive.[11]  (SF ¶¶56-57; Bohne Dep., 174, 274, 356.)  According to Bohne, in doing the former, he blew the whistle on the fact that CA had overbooked, or recognized too much revenue in relation to, the Allmerica Deal.  With respect to the commission

---

[10] For instance, while Bohne contends that CA engaged in practices to push older employees out, he could not identify anyone to whom this happened.  (SF ¶76; Bohne Dep., 190.)  In Clinton v. Beverly Enterprises-Massachusetts, Inc., the Court acknowledged that "one of the most probative means of establishing that the plaintiff's termination was a pretext for racial discrimination is to demonstrate that similarly situated employees were treated differently."  1998 WL 118224, at **4.  The Court granted the defendant employer's motion for summary judgment because "[t]he record in this case is absent of any evidence which demonstrates a similarly situated individual received disparate treatment."  Id.  Similarly, Bohne has failed to provide evidence of disparate treatment.  He provided a single example of another employee whom he contends CA terminated because of his age - in 1995.  (SF ¶76; Bohne Dep., 192-93.) He does not point to a single remark or comment by a CA manager that is probative of age animus. (SF ¶77; Bohne Dep., 185, 189-91, 200-18.)

[11] Bohne incorrectly asserts that CA commissioned another Sales Executive, Tom Alessi, on the part of the deal that included AION.  The evidence does not support that assertion.  (SF ¶¶50-55; Bohne Dep., 173, 175-76; Exh. 12, at CA 1048; Exh. 14.)

issue, Bohne claims that he blew the whistle on the fact that CA had mis-categorized some of the Allmerica Deal as new product for improper financial purposes.[12]  (SF ¶50; Bohne Dep., 174-76.)  Finally, in an effort to further support his claims, Bohne mistakenly contends that CA, in fact, understood that the Allmerica Deal entailed assuming payment obligations on behalf of Allmerica and suggests that CA intentionally ignored that fact so that it could recognize more revenue in connection with the deal. (SF ¶¶58-64; Bohne Dep. 143-45, 235-37.)

An employer may be liable for terminating an at-will employee for a reason that violates a clearly-defined public policy.  See Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 472 (1992); Terespolsky v. Law Offices of Stephanie K. Meilman, P.C., 2004 Mass. Super. LEXIS 30, *15 (Mass. Super. Ct. 2004).  The issue of whether a public policy is implicated is a matter of law for the Court.  See Acher v. Fujitsu Network Communications, Inc., 354 F. Supp. 2d 26, 29 (D. Mass. 2005).  Courts narrowly interpret the public policy exception to provide redress to an employee for: (1) asserting a legal right – e.g., filing a worker's compensation claim, (2) doing what the law requires – e.g., serving on a jury, or (3) refusing to do that which the law forbids – e.g., committing perjury.  See Hinchey v. NYNEX Corp., 144 F.3d 134, 145 (1st Cir. 1998); Flesner v. Technical Communications Corp., 410 Mass. 805, 810 (1991); Terespolsky, 2004 Mass. Super. LEXIS at *16.  The public policy exception does not protect all employee acts that are "appropriate [or] socially desirable," nor does it extend so far as to encompass all employee acts "that are directed to illegal, unsafe, or unethical conduct." Acher v. Fujitsu Network Communications, Inc., 354 F. Supp. 2d 26, 29 (D. Mass. 2005).

According to Bohne, the following constitutes his whistle blowing conduct:

---

[12] In fact, contrary to Bohne's unfounded assertion, CA did not categorize any of the Allmerica Deal as new product.  (SF ¶¶49-52; Bohne Dep., 259-61; Exh. 14.)

Q:    And how did you blow the whistle?

A:    When the client Larry DelBono specifically contacted me
and said, oh, by the way, I still have – I just received an
invoice from the Platinum Financing Company … for
$94,000 and he said to me weren't we supposed to include
that in our deal?  I researched my paperwork, my proposals
and my BARF, and it came to light to my attention that the
answer is yes, that was supposed to be including [sic] the
deal.  Okay.  I brought that to the attention of Jean Schultz
witnessed by Irene Salvatore.

(SF ¶¶56, 57; Bohne Dep., 168.)  Bohne testified that Schultz's reaction to his alleged whistle

blowing was minimal:  "Jean's initial reaction was, well, we probably didn't know about it."  (SF

¶26; Bohne Dep., 170.)  According to Bohne, Schultz simply believed that CA did not pay the

third-party financer because CA was not aware that Bohne had so obligated CA as part of the

Allmerica Deal.

Bohne's voicemail to Jean Schultz was even less suggestive of whistle blowing:

Q:    And you told her what in that voice mail?

A:    I'm going to paraphrase, forgive me.  To the best of my knowledge
it was I did not want to be dinged.  Dinged means have any
commission adjustment for AION, because I had not been
commissioned on that product.

(SF ¶¶26, 57; Bohne Dep., 274.)

In short, Bohne's alleged whistle blowing consisted of nothing more than a notifying CA

that the Allmerica Deal, which Bohne himself had put together, was inaccurately booked and

requesting that he not be "dinged" on commissions he did not receive.  (SF ¶¶56-57; Bohne

Dep., 174, 274.)  Given these facts, it cannot be disputed that, in either case, Bohne was not

asserting a legal right, doing what the law requires, or refusing to do that which the law forbids.

See Hinchey, 144 F.3d at 145.  Moreover, there is no evidence that either Bohne or Schultz

viewed his comments regarding the Allmerica Deal or his commissions as whistle blowing.

Indeed, by Bohne's own account, Schultz indicated that if CA had not made a payment on Allmerica's behalf it was because CA did not know that it was obligated to do so. (SF ¶26; Bohne Dep., 170.) Moreover, in his voicemail message he did not assert that the deal had improperly been categorized as new product, just that he did not want his commission reduced incorrectly. (SF ¶57; Bohne Dep., 174.)

Nor does Bohne's contention that CA understood that it was assuming this substantial payment obligation and intentionally overbooked the Allmerica Deal have merit because there is no evidence to support that assertion. Bohne relies on the following statement, made on the Credit Package Cover Form: "Please note supplements 1015403-0003 & 004 were included in the pricing of the new agreement per the BARF (Netmaster products)."[13] (SF ¶60; Exh. 12, at CA 1088.) According to Bohne, the person who completed this form:

> A:    . . . picked up [that] the supplement 04, 03 and 04 were included in the deal and the BARF Netmaster products [but] he didn't pickup the Aion products. So he managed to read the BARF that said there were pre-committed payment for Netmaster and Aion but only credited the deal for the Netmaster products.
>
> Q:    So what benefit would CA have in doing that?
>
> A:    Overbooking.

(SF ¶¶58-61; Bohne Dep., 143.) Bohne apparently assumes that these supplement numbers relate to the payments for Netmaster that Allmerica owed to the third party finance company. (SF ¶62; Bohne Dep., 235-37, 240.) Bohne's assumption is incorrect.

The employee who completed this form was responsible for ensuring that the Allmerica Deal was correctly entered into CA's system. It appears that in the course of reviewing information on each product involved in this deal in CA's TOPS system, he discovered that,

---

[13] CA uses this form to ensure that it credits customers for invoices to be issued or payments due under an existing licensing agreement that are now covered by a new licensing agreement. (Schultz Aff., ¶18.)

under the prior licensing agreement, Allmerica would be invoiced for future payments to CA for usage and maintenance fees associated with Netmaster for a time period covered by the new licensing agreement (i.e., the two deals overlapped).  CA's TOPS system reflects that the supplement numbers referred to in this note were associated with these fees.  The note shows that the employee simply took steps to ensure that CA would not issue invoices for those fees because he believed that they had been rolled into the March 2002 Deal.  In contrast, CA's TOPS system does not reflect that Allmerica owed a third party money on the Netmaster and AION software because when CA acquired Platinum, Platinum had already been paid in full for those products.  In other words, this note merely reflects that CA understood that certain fees for which it would otherwise have invoiced Allmerica were included in the March 2002 Deal.  It does not reflect that CA was aware that Bohne had committed CA to make payments for the Netmaster software to a third party on Allmerica's behalf.   (SF ¶¶16-17, 63-64; Schultz Aff., ¶¶18-19.)

Bohne's claim also fails because none of his allegations implicate an important public policy.  In Hinchey, the plaintiff claimed that he was terminated for notifying his supervisor about "business and procurement irregularities" at NYNEX.  144 F.3d at 139.  The Court found that the plaintiff's claim involved internal matters and "is not one for which Massachusetts courts have accorded legal redress."  Id.  The SJC reached the same result in Mello v. Stop & Shop Companies, Inc., 402 Mass. 555 (1988).  In that case, the Court held that the plaintiff, an at-will employee, was not discharged in violation of public policy.  The plaintiff, an assistant manager, had complained to his supervisors about false claims against the company's manufacturers and suppliers.  The Court determined that "[t]hese claims within the company concern internal matters.  No well defined public policy principle would have been violated had Mello been discharged because he reported those alleged wrongs."  402 Mass. at 560-61.  The same is true in

this case. These claims involve internal matters of CA's policies relating to booking deals and calculating commissions; they do not implicate any of the three recognized public policy exceptions for which an at-will employee can seek redress for wrongful termination. Hinchey, 144 F.3d at 145.

Further, Bohne "must provide evidence – not mere assertion or speculation – supporting his claim that he was terminated" for allegedly notifying CA that the Allmerica Deal was overbooked or requesting that his commissions not be adjusted. Hinchey, 144 F.3d at 145. In this instance, Bohne cannot point to any conduct or comments which support the conclusion that CA made the decision to terminate Bohne's employment for any reason other than that his bungling of the Allmerica Deal was sufficiently egregious to warrant that response.

Because Bohne's conduct does not amount to whistle blowing and the termination of his employment does not fall within one of the few, narrow public policy exceptions, his claim that he was terminated in violation of public policy must fail as a matter of law.

### B.    The Massachusetts Whistleblower Statute Does not Apply to Private Employers.

In Count III, Bohne alleges that CA terminated his employment in violation of M.G.L. c. 149, § 185. This statute makes it unlawful for an employer to retaliate against a whistleblower employee. The statute defines an employer as "the commonwealth, and its agencies or political subdivisions, including but not limited to, cities, towns, counties and regional school districts, or any authority, commission, board or instrumentality thereof." M.G.L. c. 149, § 185(a)(2). Because the whistle blower statute does not provide a remedy to private sector employees, this claim must be dismissed. See Nishan v. O'Brien, 2000 WL 33159250, **3 (Mass. Super. Ct. 2000) (dismissing plaintiff's complaint because the whistleblower statute does not apply to private employers).

**IV.     CA DID NOT BREACH THE COVENANT OF GOOD FAITH AND FAIR DEALING WITH RESPECT TO PAYMENT OF COMMISSIONS TO BOHNE.**

Bohne was an at-will employee at CA.  (SF ¶2; Arato Aff., ¶2.)  As such, CA was entitled to terminate Bohne "at any time and for any or no reason."  Bergeson v. Franchi, 783 F. Supp. 713, 717 (D. Mass. 1992); see also, Acher, 354 F. Supp. 2d at 29; Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 100-01 (1977).  In Massachusetts, an obligation of good faith and fair dealing is implied in an at-will employment contract to impose liability on an employer "for the loss of compensation that is so clearly related to an employee's past service, when the employee is discharged *without good cause*."  (Emphasis added.)  Joyal v. Hasbro, Inc., 380 F.3d 14, 20 (1st Cir. 2004) (citing Gram v. Liberty Mut. Ins. Co., 384 Mass. 659 (1981)); see also, Sargent v. Tenaska, Inc., 108 F.3d 5, 7 (1st Cir. 1997) ("[o]ne condition [for recovery of unpaid commissions] is that the discharge have been done in bad faith"); Cort v. Bristol-Meyers Co., 385 Mass. 300, 304 (1982).

Whether "good cause" exists is determined by an objective standard.  See Joyal, 380 F.3d at 20.  The question is whether the employer's articulated reason for discharge is a legitimate one as opposed to one that is dishonest, arbitrary, or trivial.  Id. at 21.  An employer does not act in bad faith simply because it is motivated by its own legitimate business interests.  See Trent Partners and Assocs., Inc. v. Digital Equipment Corp., 120 F. Supp. 2d 84, 102 (D. Mass. 1999) (citing Fortune v. Nat'l Cash Register Co., 373 Mass. at 101-02)).  Thus, in order to establish a breach of the covenant of good faith and fair dealing, Bohne must prove that CA terminated him without good cause and in bad faith in order to deprive him of commissions that he earned for work already performed.  See Michelson v. Digital Financial Services, 167 F.3d 715, 726 (1st Cir. 1999).

In this case, Bohne specifically bases this claim on CA's failure to pay him certain commissions, some dating back to the early 1990s.[14]  Bohne's claim must fail because CA terminated his employment for good cause.  In Joyal, the Court denied the plaintiff's claim for an unpaid bonus because the defendant employer did not act arbitrarily or with discriminatory animus when it discharged a 55-year-old employee who sought, among other things, to violate established company policy.  Joyal, 380 F.3d at 19.  CA was similarly justified in terminating Bohne's employment based on his conduct in relation to the Allmerica Deal, particularly during a time when the Framingham office sales staff had just been investigated for inflating their commissions – a consequence of Bohne's conduct as well.

Moreover, there is no evidence that CA terminated Bohne in order to prevent him from collecting commissions.  With respect to the Starwood and National Life deals, which occurred in 1999 and 2000, there is no evidence that CA was aware in 2002, when it terminated his employment, that Bohne believed he was entitled to greater commissions on those deals.  He admits that after initially requesting that those commission be paid he stopped actively pursuing them.  (SF ¶72; Bohne Dep., 309, 313-16.)  Moreover, the decision to terminate Bohne's employment is so disconnected in time from those deals that the timing alone does not support finding a causal connection.  Similarly, there is no evidence that CA's decision was motivated by the desire to prevent him from collecting the National Grid commission.  Rather, CA merely applied the operative Sales Compensation Plan, which provided that, where a Sales Executive's employment ended,  ". . . [c]ommission will be paid on an 'incomplete' transaction if the only

---

[14] Bohne testified that he is owed commissions for the following deals which occurred in the years indicated: (1) Dun & Bradstreet, Sept. 1992, $20,000; (2) Cigna, March 1992, $10,000; (3) Aetna Life Insurance, 1993, $30,000; (4) Starwood Hotels, Oct. 1999, $30,000; (5) National Life, June 2000 $40,000; (6) National Grid, July 2002, $162,588.  (SF ¶¶65, 71, 72; Bohne Dep., 286-89.)  CA addresses only those deals (Starwood Hotels, National Life, and National Grid) that occurred within the six-year statute of limitations because the rest are time-barred.  See M.G.L. c. 260, § 2.

open condition is CA's receipt of payment and that payment is actually received by CA within

30 calendars following the employee's termination or resignation."  (SF ¶¶66-67; Exhs. 3, 4,

Section 10 – Termination, subsection II, Final Commissions.)  CA, which had no control over

when National Grid would make its payment, did not receive payment from National Grid within

30 calendar days of Bohne's termination; therefore, Bohne was not and is not entitled to a

commission.  (SF ¶66; Exh. 16.)  In short, there is no evidence that CA terminated Bohne's

employment to avoid paying him commissions to which he was entitled.

## CONCLUSION

For the foregoing reasons, Defendant CA respectfully requests that this Court grant it

summary judgment on Plaintiff's complaint and dismiss this action with prejudice, with costs,

attorneys fees and such other relief as is appropriate.

<div style="margin-left:40%">

Respectfully submitted,
DEFENDANT,
COMPUTER ASSOCIATES
INTERNATIONAL, INC.,
By its attorneys,

/s/ Brigitte Duffy_____
Brigitte Duffy (BBO # 565724)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:     (617) 946-4800
Telecopier:     (617) 946-4801
</div>

Date:  August 1, 2005

## Local Rule 7.1(A)(2) Certification

I hereby certify that I have attempted in good faith to confer with plaintiff, who is *pro se*,
in an attempt to narrow or resolve the issues raised by this motion.

<div style="margin-left:40%">

/s/ Brigitte Duffy_____
</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2005, the foregoing Motion was served upon Plaintiff *pro se,* John Bohne, 34 Kenmare Way, Rehoboth Beach, DE 19971, by forwarding a copy of same via FedExpress, overnight delivery, postage prepaid.

/s/ Brigitte Duffy