UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN BOHNE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C. A. NO. 04CV10068WGY |
| | ) |
| COMPUTER ASSOCIATES INTERNATIONAL, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1,

Defendant Computer Associates International, Inc. ("CA" or "the Company") submits the

following statement of material facts as to which there is no genuine dispute to be tried.

**Background**

1.      CA is one of the world's largest computer software companies.  The Company

employs a sales force of Sales Executives who market and sell licenses to its software products

and related professional services to companies throughout the United States and abroad.

(Affidavit of Alexander Arato ("Arato Aff."), attached as Exhibit 1, ¶2.)

2.      Plaintiff John Bohne ("Bohne" or "Plaintiff") was employed, at will, with CA in

various sales or sales management capacities from February 14, 1983 until August 19, 2002.

(Deposition of John Bohne ("Bohne Dep."), excerpts attached as Exhibit 2, 13-15; Arato Aff.,

¶2.)  At the time of his termination, he was a Sales Executive in CA's Framingham office.

(Bohne Dep., 15, 36.)

3.      During Bohne's employment with CA, CA compensated its Sales Executives with a base salary and commissions calculated on the net value of sales completed.  (Bohne Dep., 77, 257; Arato Aff., ¶3.)

4.      Each fiscal year, CA issues its Sales Executives a Sales Compensation Plan which sets out guidelines for Sales Executives to follow in conducting business and sets forth the general terms that apply to the payment of commissions.  In addition, each Sales Executive receives an individual letter that sets out his or her individual base salary, commission quotas and commission rates.  (Bohne Dep., 277-79; Excerpts from Sales Compensation Plan for Fiscal Year 2002 (April 1, 2001-March 31, 2002) and Fiscal Year 2003 (April 1, 2002-March 31, 2003), and the Wealth Enabling Plan welcome letters CA issued to Bohne for those fiscal years are attached as Exhibits 3, 4, 5, and 6.) [1]

5.      Before making a formal sales proposal to a customer or potential customer, CA Sales Executives must complete and obtain approval of a Business Analysis Review Form (known at CA as the "BARF") and related documents including an Order Form and Addendum, which contain the proposed terms of the deal (hereafter these documents are referred to jointly as the "BARF").  (Bohne Dep., 21-23, 76; Exhibit 4, at CA 1288; Affidavit of Jennifer Pilato ("Pilato Aff."), attached as Exhibit 7, ¶3; Arato Aff., ¶4.)

6.      On the BARF, Sales Executives are expected to provide information on the proposed terms of the deal, including the products to be licensed, the price of the products, the proposed discount, the payment terms, and projected CA expenditures.  (Pilato Aff., ¶4; Bohne Dep., 76.)

---

[1] To facilitate the Court's ability to locate specific parts of Exhibits, CA has placed page numbers on exhibits that are not bates stamped to allow specific page citations where appropriate.

7.      During Bohne's tenure with CA, Sales Executives were required to submit the BARF to an assigned member of CA's Global Sales Operations ("GSO") staff who, based on the information provided by the Sales Executive, determined whether to approve the proposed terms of the deal on behalf of GSO based on CA's license policies.  (Pilato Aff., ¶2-4; Arato Aff., ¶5.)

8.      The terms of each deal and/or the proposed contract documents (an Order Form and Addendum) were subsequently reviewed by personnel in the Legal, Contract Administration, and Finance Departments (if appropriate pursuant to CA's policies).  (Pilato Aff., ¶3; Arato Aff., ¶5.)

9.      In order for GSO to assess whether a proposed deal complied with CA's licensing policies, Sales Executives were required to provide clear and accurate information on the BARF outlining all aspects of the deal.  On the BARF, Sales Executives had to take into account and disclose any terms – such as an agreement by CA to either assume payments owed to a third party on behalf of a customer or to forgive payments owed by a customer to CA – that would decrease the net value of a deal.  (Bohne Dep., 40; Pilato Aff., ¶¶2, 4; Exhibit 4, at CA 1288.)

10.     In March 2002, CA's BARF form consisted of worksheets at Tabs A - F.  The type of deal for which a BARF was submitted would determine which tabs the Sales Executive was required to complete.  (Pilato Aff., ¶6.)

**The Allmerica Deal**

11.     On March 19, 2002, Bohne submitted a BARF for a proposed deal with First Allmerica Financial ("Allmerica") to Jennifer Pilato, the GSO Business Manager for New England in the Northeast Region, who was responsible for reviewing Framingham office deals. (Pilato Aff., ¶2, 5; copy of email dated March 19, 2002 from John Bohne to Jennifer Pilato and attached BARF, attached as Exhibit 8.)

3

12.    Bohne's proposed March 2002 deal with Allmerica ("Allmerica Deal" or "March 2002 Deal"), an existing customer, involved products for mainframe computers and entailed a conversion for certain software previously licensed to Allmerica from CPU licenses to MIPS based licenses.  CPU stands for Central Processing Unit, and denotes a stand alone mainframe computer.  MIPS stands for Millions of Instructions Per Second, and is a measure of computer processing power.  A CPU license limits a customer's use of the licensed software to specific CPU(s) or machine(s).  A MIPS based license allows the customer to use the licensed software on one or more CPUs, and instead sets a limit on the aggregate number of MIPS the customer may use in connection with the licensed program.  (Affidavit of Jean Schultz ("Schultz Aff."), attached as Exhibit 9, ¶13.)

13.    Over the next week or so, Bohne submitted subsequent versions of the Allmerica BARF to Pilato in which the financial terms of the proposed deal changed.  (Pilato Aff., ¶5.)

14.    Ultimately, on March 25, 2002, Bohne submitted a revised BARF and Addendum to Pilato by email.  That same day, she replied and advised Bohne that the BARF was approved by GSO.  She asked a paralegal, Kelley Curley, to review the Addendum and advised Bohne that he would need further approvals.  (Pilato Aff., ¶5; March 25 email from John Bohne to Jennifer Pilato and the attached BARF and Addenda, attached as Exhibit 10; March 25 email from Jennifer Pilato to John Bohne, attached as Exhibit 11.)

15.    Based upon the information Bohne had submitted, the Allmerica Deal received all necessary approvals by March 28, 2002.  According to Bohne's final BARF, the Allmerica Deal was purportedly worth a net value of approximately $1.8 million, to be paid in three installments over three years.  (Excerpts from the Sales Administration file (CA 1036-93), attached as Exhibit 12, at CA 1038, 1054.)

4

16.     As part of its conversion to MIPS based licenses in the March 2002 Deal, Allmerica purchased MIPS based licenses for three different product groups with three different MIPS capacities.  Exhibit A to the Addenda for the March 2002 Deal reflects those separate Products Groups, A through C.  Paragraph 4 of the Addendum, which addresses authorized use of the licensed software, shows the different MIPS capacity licensed for each Product Group. (Schultz Aff., ¶14; Exhibit 12, at CA 1048, 1052, 1054.)

17.     When CA's Sales Accounting Department enters information about a deal into CA's database, known as TOPS, it gives each product group a unique supplement number.  In the case of the Allmerica Deal, CA designated the following supplement numbers for the separate product groups:

- Product Group A –740 MIPS – Supplement No. 0598868-016,

- Product Group B – 2115 MIPS – Supplement No. 0598868-017, and

- Product Group C – 855 MIPS – Supplement No. 0598868-018.

(Schultz Aff., ¶15; Exhibit 12, at CA 1048, 1052, 1054.)

18.     At the time of the March 2002 Deal, Allmerica still owed money for the Netmaster and AION products that it had originally licensed from Platinum Technology, Inc. ("Platinum"), a company that CA had subsequently acquired.  Because Allmerica had financed these licenses through a third party and the third party paid Platinum for the licenses up front, the remaining two payments on each license were owed to the third party financer, not to CA.  CA's TOPS database did not reflect that Allmerica owed this money on these products because it did not owe the money to CA.  (Schultz Aff., ¶3; Bohne Dep., 145; email from Jean Schultz to Peter Bordonaro, dated August 19, 2002, attached as Exhibit 13.)

19.     As part of the Allmerica Deal, Bohne negotiated that CA would assume responsibility for making Allmerica's two remaining payments to the third party on the

Netmaster and AION licenses. (Bohne Dep., 70.) CA's assumption of these payments would thus decrease the net value of the deal. (Id., 71.) The total amount of the payments owed by Allmerica to the third party financer that Bohne committed CA to pay on Allmerica's behalf was $227,048.00. (Schultz Aff., ¶4; Exhibit 13.)

20.    When Jennifer Pilato reviewed Bohne's BARF, she did not see information that caused her to understand that Bohne was proposing as part of this deal that CA would assume the obligation to make the $227,048.00 in payments that Allmerica owed to the third party. (Pilato Aff., ¶7.)¶

21.    Bohne only completed and submitted to Pilato Tab B of the BARF and a series of Excel spreadsheets. (Pilato Aff., ¶8; Exhibit 12, at CA 1059-1068; see also Exhibit 10.) The final spreadsheet, which he called "Allmerica Financial Three Year Financial Projection," showed the alleged total value of the various components of the deal and the payment stream to CA over three years. The total of the payment stream corresponds to the $1.8 million gross value of the deal without any reference to the $227,048.00 financial commitment on Allmerica's behalf. Nowhere on this spreadsheet did Bohne indicate that CA would be assuming payments Allmerica's obligation to pay a third party $227,048.00. (Exhibit 12, at CA 1068; Schultz Aff., ¶7; Pilato Aff., ¶8.)

22.    Because the $1.8 million payment stream did not take into account the payments CA would be obligated to make on Allmerica's behalf pursuant to Bohne's agreement, CA recognized greater revenue and paid higher commissions on the deal than it should have. (Schultz Aff., ¶8.)

**Bohne's Termination**

23.    In or around mid-August 2002, Bohne's contact at Allmerica complained to Bohne that CA had not made a payment to a third party that had recently come due on the AION license.  (Bohne Dep., 168.)

24.    At the time, Jean Schultz, Pilato's then Manager in GSO, was present in the Framingham office.  (Bohne Dep., 168; Shultz Aff.,  ¶¶1, 2.)

25.    Bohne approached Schultz while she was with another CA manager and recounted that Allmerica had received an invoice from the third party seeking the approximately $94,000 payment due on one of the two products.  (Bohne Dep., 168.)  He told her that the payment "was supposed to have been included as part of the deal for Allmerica and that the client should not be obligated to pay that $94,000."  (Bohne Dep., 168-69; Shultz Aff., ¶2.)

26.    Jean Schultz's reaction was, "well, we probably didn't know about it."  (Bohne Dep., 170.)  Bohne returned to his desk and reviewed the Allmerica BARF.  He subsequently showed or described to Schultz three places in the BARF where he claimed he showed this financial term of the deal.  (Id., 171-72.)

27.    Shortly after this interchange, Bohne accessed CA's commission system and found that another Sales Executive, who he assumed was Tom Alessi, a Sales Executive also assigned to the Allmerica account, had been commissioned on part of the deal.  (Bohne Dep., 172-73; 262-63.)

28.    Bohne then contacted Schultz by phone and left her a voicemail message in which he told her that his commissions should not be adjusted because he had not been commissioned on that part of the deal for which the value was now reduced as a result of CA's obligation to make payments on behalf of Allmerica.  (Bohne Dep., 174, 274.)

29.    Bohne testified as follows:

> I didn't get her but I left her a voicemail.  Okay.  In my voicemail, I told Jean I
> did not want to be "dinged" for the Aion piece of this deal when it got backed out
> because I was never paid on it.

(Bohne Dep., 274.)

30.     When Bohne disclosed to Schultz that both he and Allmerica had intended the March 2002 Deal to include CA's assumption of the obligation to make the future payments Allmerica owed on the AION and Netmaster software, she reviewed the BARF that he had submitted to GSO in March 2002.  (Schultz Aff., ¶5.)

31.     She found that Bohne had not clearly articulated this proposal.  Bohne included a single, confusing and ambiguous statement in a box entitled "Business Description" on Tab B of the BARF:

> The Client currently has a CPU licenses [sic] and wishes to go to a MIPS based
> License.  The Pre-commeted [sic] payment for Endevor and Intertest will survive
> the agreement.  The BAU includes the Precommited Payment for Netmaster and
> Aion.  Since those terms are less than 3 years and they will upgraded as a result of
> this transaction, [sic]"

BAU means business as usual.  (Schultz Aff., ¶5; Exhibit 12, at CA 1059; see also Exhibit 10.)

32.     His single sentence about the "pre-committed" payments was ambiguous because he did not make it clear that he intended (and had communicated to the client with prior approval) that CA would assume responsibility for the "pre-committed" payments.  (Schultz Aff.,  ¶¶5, 6.)

33.     More importantly, none of the spreadsheets that Bohne submitted with the BARF took into account this financial term of the proposed deal.  In particular, on a spreadsheet called "Allmerica Financial Three Year Financial Projection," which showed the total value of the various components of the deal and the payment stream to CA, Bohne did not state that CA would be assuming any, much less all, the payments owed by Allmerica to a third party. Nonetheless, the total of the payment stream corresponded to the $1.8 million value of the deal.

(Schultz Aff., ¶¶7, 10, 11; Exhibit 12, at CA 1060-68.)  Further, neither the Order Form nor Addendum included a provision that provided for CA's assumption of these payment obligations.  (Schultz Aff., ¶¶7, 11; Exhibit 12, at CA 1079-87.)

34.    After determining what had occurred, Schultz contacted Peter Bordonaro, a Business Manager in GSO, to discuss out what steps CA would have to take to address this error because it was apparent that CA had recognized more revenue from the March 2002 Deal than it should have and had paid higher commissions than appropriate.  (Schultz Aff., ¶¶8, 9; Exhibit 13.)

35.    On Saturday, August 17, 2002, Bordonaro advised Alexander Arato, an attorney in CA's Legal Department about what had occurred.  (Arato Aff., ¶6.)

36.    At the time, Arato was involved in an investigation of very serious misconduct by members of the Framingham office sales team that involved falsifying documents relating to CA deals in order to improperly inflate the commissions they received from CA.  As a result of this misconduct, CA terminated the employment of multiple sales and sales management employees.  Among those whose employment CA terminated was Kim Livolsi, Bohne's manager at the time.  (Arato Aff., ¶7.)

37.    On the next business day after Arato learned of Bohne's conduct, CA was scheduled to hold an event for the remaining Framingham staff, attended by CA's then Chief Executive Officer, Sanjay Kumar, and CA's then Senior Vice President, Worldwide Head of Sales, Stephen Richards, that was intended to signify the end of the formal internal investigation of the Framingham office. (Arato Aff., ¶8.)

38.    Given what had occurred in Framingham and the upcoming event, Arato immediately advised Kumar and Richards of Bohne's alleged conduct.  (Arato Aff., ¶9.)

39.    Richards directed Arato to review the BARF Bohne submitted and determine whether Bohne had properly accounted for the payment to the third party finance company in his financial calculations of the value of the Allmerica Deal, which Bohne had submitted for purposes of (among others things) calculating his anticipated commission.  Richards instructed Arato that CA would terminate Bohne's employment if Bohne did not properly disclose this obligation, but that if Bohne had disclosed this obligation on the page of the BARF in question, and CA's staff had missed it for some reason, CA should not terminate his employment.  (Arato Aff., ¶10.)

40.    Arato reviewed the BARF along with Bordonaro and found that in the Financial Projections spreadsheet in which Bohne calculated the value of the Allmerica Deal, Bohne had failed to account for CA's assumption of the payments to the third party finance company. (Arato Aff., ¶11.)

41.    As a result, pursuant to Richard's instructions, CA terminated Bohne's employment.  CA carried this decision out quickly because it was important to do so before the Framingham event commenced on August 19, 2002.  (Arato Aff., ¶12.)

42.    Accordingly, on August 19, 2002, just before the event with Kumar, the Framingham office Human Resource Representative advised Bohne that CA was terminating his employment effective that day.  (Bohne Dep., 177-78.)

43.    At the time of his termination, Bohne was 59 years old.  (Bohne Dep., 184.)

**Bohne's Allegations**

**A.    The Allmerica BARF**

44.    According to Bohne, there are several places on the BARF where he disclosed the commitment on behalf of CA to make the outstanding payments on the Netmaster and AION licenses due from Allmerica to the third party finance company.  (Bohne Dep., 70-72, 247-50.)

45.     First, Bohne contends that his statement on Tab B of the BARF, in the box entitled "Business Description," quoted in Paragraph 31 above, was a sufficient disclosure of this term.  (Bohne Dep., 70-72, 248.)   According to Bohne, this statement made it clear that he was proposing that CA assume these payments on Allmerica's behalf.  (Id., 248.)  Bohne also points out that he used colored text to emphasize his proposal.  (Id., 72.)

46.     Second, on one of the spreadsheets he attached to the BARF, he listed yearly costs for various products including $94,024 for AION and $19,500 for Netmaster.  In addition, on the spreadsheet, he noted that each had remaining payments.  (Bohne Dep., 246-47; Exhibit 12, at CA 1066.)

47.     Bohne, however, did not indicate on this spreadsheet that CA was assuming any, much less all, of these payments.  (Schultz Aff., ¶11; Exhibit 12, at CA 1066.)

48.     Third, on yet another spreadsheet, Bohne again listed the costs for various products, including AION and Netmaster, but failed to disclose that CA would be assuming remaining payments on those products.  (Bohne Dep., 250; Exhibit 12, at CA 1067; Schultz Aff., ¶12.)

B.     **Commissions on the Allmerica Deal**

49.     Bohne claims that CA did not commission him on the $227,048.00 commitment that he made on CA's behalf and, therefore, if CA adjusted commissions, it should not adjust his commissions.  (Bohne Dep., 173-74, 274.)

50.     Bohne also suggests that CA commissioned Alessi on part of the Allmerica Deal so that it could improperly treat a portion of the deal as being for new product, rather than as a conversion of existing licenses, because Wall Street analysts view new product sales more favorably.  (Bohne Dep., 173, 175-76.)

**i.     CA did not treat any portion of the Allmerica Deal as new product.**

51.     Bohne's commission statement for March 2002, reflects that CA commissioned
him on all but $200,000 of the value of the Allmerica Deal.  The commission statement shows
the value of the three supplements for the three Product Groups that comprised the Allmerica
Deal.  (Copy of Bohne's March 2002 Commission Statement (CA 1231-36), attached as Exhibit
14; Bohne Dep., 265.)  The statement reflects that $200,000 from Supplement No. 0598868017,
went to the "IM Group."  (Exhibit 14, at CA 1233; Bohne Dep., 261.)  His commission statement
reflects that the type of business was T & C, "Time and Capacity," not NP, "New Product."
(Exhibit 14, at CA 1233; Bohne Dep., 259-61.)

52.     Alessi's March 2002 Commission Statement reflects that CA credited him with
"$200,000 bv [booking value] from OS/390" of the same supplement.  (Tom Alessi's
Commission Statement for March 2002 (CA 1264-69), attached as Exhibit 15, at CA 1267;
Bohne Dep., 265.)  His commission statement reflects that the type of business was Time, not
New Product. (Exhibit 15; Bohne Dep., 271-72.)

**ii.     CA commissioned Bohne on the AION product.**

53.     Bohne claims that CA commission Alessi, not him on the AION products.
(Bohne Dep., 173, 175-76.)

54.     In fact, the Supplement for which Alessi received commissions did not include
any AION products.  (Schultz Aff., ¶15; Paragraph 4 of Addendum (Exhibit 12, at CA 1048)
lists the MIPS associated with each Product Group; Exhibit A to Addendum (Exhibit 12, at CA
1052) lists the products included in each Product Group; and Contract Cover Form (Exhibit 12,
at CA 1054) lists the MIPs associated with supplement.)

55.     Moreover, Bohne's commission statement reflects that CA commissioned him on the supplement that included AION.  Accordingly, CA paid Bohne commissions on the AION product.  (Exhibit 14; Exhibit 12, at CA 1048, 1052, 1054.)

**C.      Whistle Blowing**

56.     Bohne contends that his initial conversation and subsequent communication with Schultz, in which he told her about Allmerica's complaint and showed her where he accounted for the payments on the BARF, constitute whistle blowing.  At the time, however, Bohne did not believe CA had engaged in any improper conduct.  (Bohne Dep., 167-68, 171-72, 356.)

57.     Bohne also claims that the following voicemail message he left for Schultz regarding adjustments to his commission constitutes whistle blowing:  "I told Jean I did not want to be 'dinged' for the Aion piece of this deal when it got backed out because I was never paid on it."  (Bohne Dep., 174, 274, 356.)

58.     Bohne contends that Joshua Glas, a CA employee who reviewed the Allmerica Deal, in fact, did understand that the Company was assuming Allmerica's payment obligations on the AION and Netmaster products, and suggests he intentionally ignored that term so that CA could recognize greater revenue in connection with the Allmerica Deal.  (Bohne Dep., 143, 235-37, 240.)

59.     Bohne bases this assertion on a statement Glas included on some paperwork he completed in the process of booking this deal.  (Bohne Dep., 236.)

60.     Specifically, Glas completed the Credit Package Cover Form, which CA uses to ensure that it credits customers for invoices to be issued or future payments due under an existing licensing agreement that are now covered by a new licensing agreement.  On the form, Glas made the following comment:  "Please note supplements 1015403-0003 & 004 were included in

13

the pricing of the new agreement per the BARF (Netmaster products)." (Exhibit 12, at CA 1088;

Schultz Aff., ¶17.)

61.    According to Bohne, Glas:

A:    . . . picked up [that] the supplement 04,03 and 04 were included in the deal
and the BARF Netmaster products [but] he didn't pickup the Aion products. So
he managed to read the BARF that said there were pre-committed payment for
Netmaster and Aion but only credited the deal for the Netmaster products.

Q:    So what benefit would CA have in doing that?

A:    Overbooking.

(Bohne Dep., 143.)

62.    Bohne assumes that these supplements relate to the payments for Netmaster that

Allmerica owed to the third party finance company. (Bohne Dep., 144-45; 236-37.)

63.    Bohne's assumption is incorrect. Glas was responsible for ensuring that the

Allmerica Deal was correctly entered into CA's system. It appears that in the course of

reviewing information on each product involved in this deal in CA's TOPS system, Glas

discovered that, under the prior licensing agreement, Allmerica would be invoiced for future

payments to CA for usage and maintenance fees associated with Netmaster. (Schultz Aff., ¶19.)

64.    CA's TOPS system reflects that the supplement numbers referred to in this note

were associated with those fees. Glas's note shows that he took steps to ensure that CA would

not issue invoices for those fees because he believed that they had been rolled into the March

2002 Deal. In contrast, CA's TOPS system does not reflect that Allmerica owed a third party

money on the Netmaster and AION software because when CA acquired Platinum, Platinum had

already been paid in full for those products. In other words, this note merely reflects that CA

understood that certain fees for which it would have invoiced Allmerica were included in the

March 2002 Deal.  It does not reflect that CA was aware that Bohne had committed CA to make payments for the Netmaster software to a third party on Allmerica's behalf.  (Schultz Aff., ¶19.)

**D.    Bohne's Commission Claims**

65.    Bohne contends that CA owes him commissions on the following deals completed during the years listed:

- Dun & Bradstreet, 1992 – $20,000,

- Cigna, 1992 – $20,000,

- Aetna Life Insurance, 1993 – $30,000,

- Starwood Hotels, 1999 – $30,000,

- National Life, 2000 – $40,000, and

- National Grid, 2002 – $162,588.

(Bohne Dep., 286-90.)

66.    Bohne understands that CA did not pay him any commission on the July 2002 National Grid deal because National Grid did not pay the invoice within 30 days of his termination.  (Bohne Dep., 291; CA records documenting the date of payment, attached as Exhibit 16.)

67.    One of the provisions of the operative Sales Compensation Plan provided that in cases where a Sales Executive's employment ended:  ". . . Commission will be paid on an 'incomplete' transaction if the only open condition is CA's receipt of payment and that payment is actually received by CA within 30 calendars following the employee's termination or resignation."  (Exhibits 3 and 4, Section 10 – Termination, subsection II, Final Commissions.)

68.    Bohne acknowledges that CA used the Sales Compensation Plan issued each year as a "guide" in determining his compensation.  (Bohne Dep., 282-83.)

69.     Bohne claims that during the last several years of his employment with CA he declined to acknowledge receipt of the Wealth Enabling Plan welcome letter that CA issued to him (and all other Sales Executives) because he did not agree with some of the terms of CA's Sales Compensation Plan.  (Bohne Dep., 281, 342-45.)

70.     Bohne contends that CA's requirement that it receive payment within 30 days of his termination "would have been one of the areas [of the Compensation Plan] I would have taken exception to . . .," but concedes that before his termination he never told CA that he would not agree to that term (or any other) of the Plan.  (Bohne Dep., 284.)

71.     At the time CA terminated Bohne's employment, his claims with respect to the Cigna, Dunn & Bradstreet and Aetna deals were 10, 10 and 9 years old respectively.  (Bohne Dep., 313.)  Bohne does not recall ever raising with CA his claims that the Company owed him commissions on any of these deals.  (Id., 313.)

72.     Bohne claims that he raised concerns with CA about its decisions not to pay him certain commission in connection with the Starwood and National Life deals, but did not pursue them further out of concern that he would lose his job.  (Id., 309, 313-16.)

**E.     Bohne's Age Discrimination Claim**

73.     Bohne contends that CA terminated his employment because of his age. (Complaint, attached as Exhibit 17, ¶¶28, 29.)

74.     Bohne contends that over the years, members of CA sales management who were his superiors discriminated against him.  He kept notes when he felt his managers treated him in a discriminatory way.  (Bohne Dep., 182.)

75.     Bohne bases his age discrimination claim on his perception that he was treated unfairly and the fact that he was older than the other sales executives:

Q:      So why do you think it was related to your age, just because of your age?

16

A:     Yeah.  The practice at CA was to try to hire young account managers.  It was cheaper.

. . .

Q:     Why else do you think?  What else can you point to that is evidence of age discrimination?

A:     Age discrimination?

Q:     Age.

A:     You know, the overall staffing average age and how many account managers or account executives, whatever you want to call them, are 50 years and above.

Q:     Anything else?

A:     That's it.

(Bohne Dep., 189-90.)

76.     While Bohne contends that CA engaged in practices to push older employees out, he could not identify anyone to whom this happened.  (Bohne Dep., 190.)  He provided a single example of another employee whom he contends CA terminated because of his age - in 1995. (Id., 192-93.)

77.     Bohne could not identify a single time when any CA employee said anything probative of age discrimination.  (Bohne Dep., 185, 189-91, 200, 218.)

78.     Most of the conduct about which Bohne complains occurred years before his termination.  (Bohne Dep., 192-93; 196-97; 201-02; 335-36.)

79.     Bohne alleges the following instances of discrimination, all of which occurred during the 1990s:

a.     Bohne gave a financial/sales forecast to Joe Quaglia, a former supervisor, who neglected to include Bohne's forecast in the company's forecast.  (Bohne Dep., 181.)

b.      Bohne discussed a deal with Jim Lancing, a Senior Vice President at CA who was approximately the same age as Bohne.  During their discussions, Lancing commented that if Bohne did not secure that particular deal, it would not be good for either Lancing or Bohne.  Bohne inferred from this comment that Lancing meant neither he nor Bohne could afford to "screw up" because of their age.  (Bohne Dep., 182-83.)

c.      In 1993, when Bohne was approximately 43 years old, a CA Vice President and Senior Vice President refused to give Bohne full credit for a deal.  Bohne associated this conduct with his age because he believed he was the oldest customer service representative at that time.  (Bohne Dep., 183-85.)

d.      Victor Fasciani, a Senior Vice President at CA and Jim Lancing's supervisor, "constantly" singled out Bohne during staff meetings.  (Bohne Dep., 187.)  On one occasion, Bohne felt that Fasciani singled him out about Corning, an account in upstate New York that Bohne was given after Corning refused to meet with any account managers from CA's New York office.  During a meeting, Fasciani asked Bohne how often he visited Corning and compared his visits to another account manager who lived in Manhattan.  Bohne believes that Fasciani's comparison of Bohne with "an account manager that literally lived across the street from the account" during a staff meeting was age discrimination because the other account manager "was about, you know, 38 years of age and I was 50."  (Id., 187-88.)  Bohne admitted that Fasciani never said anything about Bohne's age.  (Id., 189.)

e.      In addition to the examples listed above, Bohne claims that "the overall staffing average age and how many account managers or account executives, whatever you want to call them, are 50 years and above" is also evidence of age discrimination.  (Bohne Dep., 189-90.)

       f.      Bohne also contends that his age discrimination claim is based on CA's practice of making it "uncomfortable" for employees Bohne's age to stay with CA and pressuring them into resigning. (Bohne Dep., 191.)  Bohne, however, could not name a single individual whom CA pressured to resign. (Id., 191-92.)

       g.      Bohne claims that his manager in 2002, Kim Livolsi discriminated against Bohne "big time." (Bohne Dep., 218.)  CA terminated Livolsi's employment before it terminated Bohne's. (Id.; Arato Aff., ¶7.)  When asked if Livolsi ever said anything that was age discriminatory, Bohne testified that, "[t]he day she was fired, she sent me an e-mail and I'll use a quote, 'you suck.'  That's all it said.  You interpret it any way you want." (Bohne Dep., 218.)

80.    None of the individuals Bohne identified as having discriminated against him based on his age – Joe Quaglia, Steve O'Keefe, Brian Sheppard, Jim Lancing, Victor Fasciani, and Kim Livolsi – were involved in the decision to terminate him. (Arato Aff., ¶9-12; Bohne Dep., 181- 219; 334-35.)

                        Respectfully submitted,

                        DEFENDANT,
                        COMPUTER ASSOCIATES
                        INTERNATIONAL, INC.,
                        By its Attorneys,

                        /s/ Brigitte Duffy
                        Brigitte Duffy (BBO # 565724)
                        SEYFARTH SHAW LLP
                        World Trade Center East
                        Two Seaport Lane, Suite 300
                        Boston, MA 02210-2028
                        Telephone:    (617) 946-4800
                        Telecopier:    (617) 946-4801

Dated: August 1, 2005

CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2005, the foregoing Motion was served upon Plaintiff *pro se,* John Bohne, 34 Kenmare Way, Rehoboth Beach, DE 19971, by forwarding a copy of same via FedExpress, overnight mail, postage prepaid.

/s/ Brigitte Duffy

20