United States District Court
District of Massachusetts

| | |
|---|---|
| John P. Bohne,<br>      Plaintiff,<br><br>v.<br><br>Computer Associates<br>International, Inc.,<br>      Defendant. | )<br>)<br>)<br>)   C.A. No.04CV10068WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## THE PLAINTIFF'S RESPONSE TO DEFENDANT COMPUTER ASSOCIATES MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff John Bohne was employed by Computer Associates from February 1983 through August 2002. During this tenure, the Plaintiff was recognized repeatedly for his accomplishments in Sales. He was responsible for over $150,000,000 in new license revenue and was awarded Compass Club trips (Achieving Quota Goals) on eleven individual occasions. The plaintiff's awards also include "Second Runner up in the World" in Fiscal Year 1985. As a Divisional Manager, he was awarded "Region of the Year-Fourth Place" in Fiscal Year 1986, Region of the Year-Second Place in 1987 and many similar awards over the years. Most recently, he was awarded First Place among hundreds of eligible Sales Executives in the North East, at a mid year Sales Meeting in October 2000, ultimately achieving Compass Club as well. His employment reviews over the years consistently ranked him in the "Top 1/3" of all divisional employees and was granted Stock Options as a reward for this performance. Prior to his joining the Defendant, the Plaintiff held various positions that required honesty and integrity. These included Director of Purchasing, Ontel Corporation, Director Purchasing and Facilities for Periphonics, Manager of Purchasing for MCI, and Senior Buyer positions in CBS and Amtrak. The Plaintiff held a "Top Secret"

1

Security Clearance while employed as an Engineer for Sperry Gyroscope that required a complete FBI background check. As for his community involvement, the Plaintiff was a Eucharistic Minister for the local Church, a Cub Scout Leader, and Soccer Coach. The Plaintiff has never been charged or convicted of any crimes.

The Defendant has not produced a single document, Affidavit or even implied that the Plaintiff had ever been reprimanded in the 19 years of service. Furthermore, the Defendant bases its justification for termination of this trusted employee on a single transaction for which he was never interviewed or questioned about, while employed. This was only one of the hundreds of similar transactions involved in selling over $150 Million worth of new licenses.

During the Defendant's presentation of "facts" they repeatedly attempted to deceive the Court by deliberately concealing information that was pertinent to the Plaintiff's case. They omitted pages from documents, provided Black & White copies of documents that were intended to be viewed and produced in color and incorrectly stated testimony by the Plaintiff taken in Deposition. In addition the defendant repeatedly makes a misrepresentation of facts ("…,he negotiated a deal on behalf of the Company in which he agreed that CA would assume more than $227,000 in payments that a customer owed to a third party,…". This statement has been refuted on both the grounds that the agreement did not "forgive" these payments and the fact that they were not owed to a third party as the statement reflects. (Refer to "Plaintiff's Correction of Material Facts in Support of Motion for Summary Judgment".)

The Defendant has embarked on path to discredit the Plaintiff by introducing a "Smoke Screen" in the form of the Allmerica transaction to divert the attention of this Court from the material facts of this case. The facts are as follows:

1. The Defendant did terminate the Plaintiff. The Plaintiff was 59 years of age and was in a protected "Class". The plaintiff had an exemplary record of performance with the Defendant prior to the termination. Moreover, the Plaintiff was replaced by someone who was significantly younger. This last fact has been deliberately avoided by the Defendant.
2. The "Whistleblower" statutes that apply here are the Federal provisions of the Sarbanes-Oxley Act of 2002, H.R. 3763 Sec 806/1541A . This act specifically protects employees from retaliation for reporting "Financial Irregularities".

2

3. The Defendant breached the covenant of good faith and fair dealing by deliberately withholding commissions and other payments that were due the Plaintiff.
4. The Defendant violated the specific requirements of Massachusetts Payment of Wages Act M. G .L c 149, Section 148 by not providing the Plaintiff with wages and accrued benefits at the time of the termination.

The reputation of the Plaintiff was also damaged as a result of the implied "misdeed" at a time when there was public information being released by the Defendant regarding apparent "irregularities" by members of the Framingham Sales Organization. These "irregularities" were never proven and no Civil Action or charges by the appropriate authorities have ever been brought against any of the individuals as a result of these allegations.[3] However, as a result, the Plaintiff's reputation for honesty and fair dealings with the customers in the New England Area was damaged, affecting his ability to secure comparable positions in the Software Industry. This forced the Plaintiff to seek alternative Sales positions in other industries and ultimately forced the sale of the Plaintiff's Massachusetts residence for financial reasons.

## Statement of Correct Facts

A. **Background**

"CA, one of ...(SF 2, 43: Bohne Dep., 15, 36.) "During...aspects of the deal."[4]

B. **The Allmerica Deal**

This section should read as follows:

"In connection with a proposed deal with First Allmerica Financial Life Insurance Company (Allmerica) in March 2002 (the "Allmerica Deal" or "March 2002 Deal"),

---

[3] No challenges were made by the Defendant for Unemployment Benefits paid to the Plaintiff or employees that were terminated, even though the terminations were "for cause" according to this Motion.
[4] On the BARF, Sales Executives had to take into account anything that would reduce the value of the deal. In addition, copies of all agreements that were to be impacted, were to be faxed to both Legal and GSO.

3

Bohne submitted several versions of the BARF to Jennifer Pilato, the GSO Business Manager for his region. Prior to a review of these BARF documents, Pilato insisted Bohne fax copies of all agreements that would be impacted by the Proposal. This is a requirement of the Sales Plan for Fiscal year 2002. The final version of the BARF for this deal was approved on March 25, 2002." The final contract value of this agreement was $1.8 million to be paid in three installments.

The following statement is completely inaccurate: "in August...Aion."[5] These facts have been proven false throughout these documents.

It is important to have the Deposition properly reported here as follows:

> "*Q. And how did you blow the whistle?*
> *A. Okay. Specifically it was with Allmerica by The way. It came to light when the client Larry DelBono specifically contacted me and said, oh, by the way, I still have -- I just received an invoice from the Platinum Financing Company, I forget the name of the company, but it was Platinum's financing company, for $94,000 and he said to me weren't we supposed to include that in our deal? I researched my paperwork, my proposals and my BARF, and it came to light to my attention that the answer is yes, that was supposed to be including the deal. Okay. I brought that to the attention of Jean Schultz witnessed by Irene Salvatore.*"[6]

"Shortly...(SF...173-74)[7]

---

[5] Allmerica had licensed Aion from Platinum and Netmaster directly from CA. It would be necessary for CA's database called TOPS to reflect all aspects of a License since this was the central "Repository" for this information upon which all accounting and legal personnel rely.

[6] Irene Salvatore was a Senior Vice President of Computer Associates in the Finance Department.

[7] The fact is that the Commission system had not been accessible for months. The amount of award has been shown to be almost $400K less that the contracted value of the deal and the only Sales Executive assigned to Allmerica from the IM group was Tom Alessi. Alessi was responsible for new Aion sales only.

### B. <u>Bohne's Termination</u>

The Defendant's attorney finally correctly states some of the facts! "After Bohne advised Shultz about this issue and disclosed that both he and Allmerica had **intended** CA to assume Allmerica's payments...on the Aion products" The relevant facts here are as follows:

    1.    As repeatedly stated, the agreement did not, nor did any document produced by the Defense and authored by the Plaintiff, forgive Allmerica's obligations with regards to the payment owed from prior agreements.

    2.    The Plaintiff was conscientious with regards to this complex transaction and did not want to misrepresent it to either the Defendant or the Allmerica. Therefore, instead of using the standard BARF format which did not lend itself to "payment obligations" and other items reflected in the transaction, the Plaintiff chose instead to attach the actual Allmerica Proposal to the BARF. This served as the common element in the transaction. Therefore, both the Defendant and Allmerica worked from the same document.[8]

Here is where the "Reasonableness" test should be applied. Is it reasonable that Allmerica would understand that the Proposal document was to include payments for Aion when CA Legal, CA Global Sales Organization, and a CA Senior Vice President for Finance do not understand this fact. Is it also reasonable that these facts would be reported by the Plaintiff to the appropriate individuals in the Finance department exposing the Plaintiff to possible disciplinary actions for this "improper conduct" if there was any wrongdoing on the part of the Plaintiff. It is difficult to understand how the Defendant's employees in GSO, Legal and a Senior Vice President of Finance, with access to License Agreements, database systems such as TOPS, and with experience and training in the interpretation of these agreements and systems, cannot

---

Recall here as well that all the products were "lumped" together on the system and no breakdown was given.
[8] Refer to the various exhibits where the BARF is attached in all versions.

5

understand these same terms. These same systems and training were not available to Allmerica.

Finally, the Defense is admitting here that there was never any obligation by CA to assume these payments. This completely contradicts statements introduced earlier (refer to paragraph 19 of "DEFENDANTS STATEMENT OF MATERIAL FACTS..."). The Statue of Frauds paragraph 2107, requires that any contract over $500, to be enforceable, must be in writing. Furthermore, Sales Executives are not authorized by the Defendant to act as Agents and thus could not enter an agreement that would obligate the Defendant in any way. This fact was well known to the Defendant at the time of the termination since one of the individuals involved in the review of these documents was a trained Attorney working in the Defendant's Legal department (Arato).

The action to terminate the Defendant was a deliberate "retaliation" for the Defendant's "Whistle Blowing" actions on Allmerica. The following facts enter into that decision:

1. The Sarbanes-Oxley Act, H.R. 3763 had just peen passed and its terms would apply to Financial Statements issued by the Defendant. The defendant was concerned about a client reporting incidents like this to the authorities and possible scrutiny that would follow.
2. The Defendants CEO and Senior Vice President of Sales did not want to expose themselves to this type of scrutiny, knowing full well, that it could lead to the discovery of other irregularities such as the back dating of agreements. (Refer to the Plaintiff's Exhibit 6).[9] Ultimately, these individuals were charged with these crimes and the CFO, Chief Legal Officer, senior members of the Accounting department and the head of GSO pleaded guilty to various charges relating to these incidents.

---

[9] Note here that the Order Form was signed by Christine Costanza and dated March 15, 2002. The testimony of the Defendant and the Plaintiff states that BARF and the proposed Agreement were circulated for various approvals starting on the 19th of March 2002. There is also a copy of another Order Form in this same package that reflects a March 29, 2002 signature. This clearly shows that the Agreements were "back dated".

6

3. The Defendant's actions to terminate employees in the Framingham Office, were designed to serve two very specific purposes. First, to cover up their own illegal activities regarding the fraudulent booking of agreements and Second, to provide reduced expenses in a Financial Quarter where the Defendant was issuing an offering of $400 Million in notes, the rates of which would be affected by this Quarterly statement. It should be noted, that the Defendant did not reflect any one-time charges or accruals to cover severance payments or benefits for the terminated employees. Refer to SEC filings Dated October 22, 2002 and December 5, 2002 attached herewith as Exhibits 11 and 12.
4. The Defendant's action to terminate the Plaintiff was motivated by all of the above and included the fact that a significant sum of money was owed to the Plaintiff for Sales Commissions for an agreement reached with company called National Grid.  These Commissions were to be paid in the Financial Quarter ending September 30, 2002...

## LEGAL ARGUMENT

I. **BOHNE CANNOT ESTABLISH A *PRIMA FACIE* CASE OF AGE DISCRIMINATION.**

As the Court has been advised, the Plaintiff is representing himself in the action (*pro se*) and does not have formal legal training. Every attempt will be made to present or refute the appropriate cases in this regard. For Specific cases and additional justification for this action, refer to Exhibit 15.

The case reference by the Defendant supports the Plaintiff's argument. A quote from that finding is as follows:

> "Under Law 100, a plaintiff establishes a prima facie case of age discrimination by (1) demonstrating that he was actually or constructively discharged, and (2) alleging

7

```
                that the decision was discriminatory. Id. If
                this minimal showing is made, the burden
                shifts to the employer to prove by a
                preponderance of the evidence that it had
                "just cause" for its actions".
```

The Defendant has failed its obligation to prove that there was any action by the Plaintiff that would constitute "improper Conduct" by the Plaintiff. Therefore, the "Burden of Proof" shifts to the Defendant to prove that the conduct of the Defendant was not discriminatory.

The Plaintiff has referred repeatedly to documents such as the Compensation Plan for Fiscal Year 2002 and 2003 This was done to deceive the Court into believing that this was a policy regarding the reporting of this information at the time of the Allmerica deal. The Defendant was fully aware that that there is no specific Policy covering "Payments to third parties" Therefore, even if it were to be believed that the Plaintiff was responsible for the lack of reporting this information, there was not violation of Company Policy in that regard. The only Policy that exists is the disclosure of "pre-committed" payments.

Furthermore, the case referenced by the Defendant, shows a deliberate pattern of abuse not one single incidence. The individuals had, over many years, abused privileges and did not exercise good judgment about the use of Company Assets. There is no similarity with the Defendant's position.

As far as this entire paragraph, the Plaintiff continues to refer the Court to the Material Facts related in the other documents. Furthermore, it expects the Court to believe that the same document reviewed and approved by the Defendant's own Finance (GSO), Legal and Accounting personnel, and used as the proposal to the client was used to deceive the Defendant. There was obviously no attempt made to conceal any facts regarding this transaction. In fact, the Plaintiff brought the information of the "Over Booking" to the attention of a member of the Finance staff witnessed by a Senior Vice President of Finance. As previously noted, there was no personal financial gain realized by the Plaintiff as a result of the actions that the Defendant has spent so much time to present here. The Defendant has clearly failed to provide any motives

8

as to why the Plaintiff would attempt in any way, to deceive the Defendant that would represent "conduct" affording the client the right to terminate the Plaintiff.

The Defendant argues here that there was no intent to discriminate against the defendant. This is totally false. Documents introduced by the Defendant during Deposition, demonstrate a long-term pattern of discriminatory actions by Senior Managers of the Defendant. None of these documents have been refuted by the Defendant as being False. Furthermore, the Defendant fails to address one area of the Act that deals with "replaced by a similarly (or less) qualified younger person". In fact, the defendant was replaced by Scot Haigh a younger Sales Executive. The Defendant will argue, that the Plaintiff's accounts were distributed among other Sales Executives. What the defendant fails to address is the fact that Scott Hague was transferred to the OS/390 group shortly after the Defendant's termination, with the intention of replacing the defendant in that group. This individual "functionally" replaced the Plaintiff since he performed the same functions and marketed the same products even though some of the actual accounts may have been different. The accounts were subject to change from time to time at the direction of the group's manager for various reasons.

II    **EVEN IF BOHNE ESTABLISHES A *PRIMA FACIE* CASE OF AGE DISCRIMINATION, HIS CLAIM FAILS BECAUSE HE CANNOT ESTABLISH THAT CA'S ARTICULATED, NON-DISCRIMINATORY REASON FO HIS DISCHARGE WAS A PRETEXT FOR AGE DISCRIMINATION.**

The defendant has relied on one particular transaction, the Allmerica Deal, as its sole reason for termination the employment of the defendant. The Defendant has failed to demonstrate that the Plaintiff was anything other than a "model" employee over the 19 years of service to the Defendant. It is here where the "Burdon of Proof" shifts to the Defendant to provide justification for terminating an employee who was in a "protected class" without proper warning and due

9

process. The Defendant's argument that the individuals that were quoted by the Plaintiff as performing Discriminatory actions were not those involved in the decision, does not really have value here since the all those individuals reported to the Steven Richards the Executive Vice President of Sales and would have been acting on his instructions. It should be clear to the Court that there was a "Motive" for this termination. That motive was to reduce expenditures both in the form of base salary as well as benefits. It is here that the Defendant would save considerable sums of money, since premiums for Health Insurance, Life Insurance and other benefits, are age dependant. The Defendant's own supplemental Life Insurance policy increased on various age dependant groups.

Again, the Defendants argument fails. The Defendant states that the Court focuses on "whether the employer believed that its proffered reason was credible". The reason for the termination was articulated to the Plaintiff as "conduct" and that conduct was the Allmerica Deal. The first notice or reason given for the termination was January 3, 2003. This was almost 4 1/2 months after the termination occurred. This letter arrived only after legal action had been indicated. The letter was authored by an Attorney (Arato) in the Defendant's Legal department. This provided more than ample time for the Defendant to "manufacture" a case to cover this Discriminatory act. (Refer to Exhibit 13 paragraph 6) This was the first and only notice ever received by the Plaintiff regarding the reason for termination.

The Plaintiff has provided significant facts that support the reason for the termination was based on "Age discrimination", Whistle Blowing" and to affect a financial gain through the avoidance of the payment of Commissions that were due the Defendant. The facts stand on their own.

Here the evidence speaks loud and clear. If the reason for the Plaintiff's termination was the handling of the Allmerica Deal, why then did the Defendant not pay any commissions that were due him on unrelated deals such as National Grid. No commissions were ever offered even though attempts were made to resolve this without legal action. (Refer to exhibit 14). It should be obvious that the underlying reason for the Defendants position is to protect the financial integrity

10

of the reports that were made to the SEC. Furthermore, the Defendant continues to misstate facts. All of the information required by the approving individuals was provided. Contract documents, financial justification and clear and accurate Proposals were jointly reviewed by both the client and the Defendant.

The Defendant claims here that there is no evidence of discriminatory intent against the Plaintiff. The actions of the Defendant speak for themselves. The Defendant terminated the Plaintiff without any prior reviews, reprimands or Notice of Unsatisfactory Job Performance by any prior supervisor, even though the law provides for protection of the "class". This is all the evidence that should be necessary. Here, the **undocumented** fact is the right of the Defendant to terminate the Plaintiff.

### III.  BOHNE"S CONDUCT DOES NOT CONSTITUTE WHISTLE BLOWING.

The public policy as stated in the Statement of Material Facts is H.R. 3763. This policy protects an Employee from retaliation should they report Financial Irregularities that could affect Financial Statements filed by the respective employer. Here, the Defendant admits that the "irregularity" was reported to a member of the Financial Organization. Furthermore, this report was made in the presence of a Senior Vice President of Finance employed by the Defendant. The Defendant had every motivation to conceal the "over booking' situation since they were concerned that public disclosure of this fact would reflect wrongdoing on the part of the Defendant. In fact the Defendant never reported the "over booking" to the SEC during any filing in 2002.

The Defendant has not addressed any of the provisions of H.R. 3763.

The Plaintiff has provided information in the CORRECTION OF MATERIAL FACTS that refutes the remaining sections here and will not restate the obvious. The Defendant expects that testimony or Affidavits with no supporting detail, would constitute "evidence". If the

11

"evidence" existed, it would have been prudent to provide it to support uncorroborated statements. There were no copies of License Agreements for either Aion or Netmaster produced by the Defendant even though they are readily available to them. This again shows the pattern of deception practiced by the Defendant.

**B. Massachusetts Whistleblower Statute does not apply to Private Employers.**

The Defendant is correct here. The motion for the Plaintiff should have read H.R. 3763. Since the Defendant is a Publicly Traded Corporation, the Federal Rules would apply here.

### IV. CA DID NOT BREACH THE COVENANT OF GOOD FAITH AND FAIR DEALING WITH REGARD TO PAYMENT OF COMMISSIONS TO BOHNE

The case law referred to by the Defendant clearly states the position of the Plaintiff. The Plaintiff has claimed from the beginning that the Defendant unjustly withheld commission payments that were due even though they were given more than ample opportunity to provide them prior to Legal actions instituted by the Plaintiff. The Defendant in contrast was motivated by the need to conceal these obligations from the public and concocted the Allmerica defense to accomplish those acts. Refer to Exhibits 13 and 14. If the Defendant had followed standard procedures for terminating an employee "for cause" by documenting facts and information about the termination at the time of the termination, these facts and information would have been available to the Plaintiff in a timely fashion. The Defendant would like us to believe that 4 ½ months is a timely response. Furthermore, the Defendant completely avoids the fact that it violated Massachusetts Payment of Wages act, M.G.L. 149 by not paying the Plaintiff wages and benefits that were due at the time of the termination.

## In Summary

The Defendant has spent the better part of almost thirty-eight pages of dialog relating to one transaction, the Allmerica Deal, to try to justify its illegal actions toward the Plaintiff. The Plaintiff has refuted all of the allegations and provided documents supporting those facts. The Defendant has failed to justify the termination since it cannot cite any rule or Policy published by the Defendant that was violated by the Plaintiff. Furthermore, the Defendant has not attempted to show that actions similar to those that they claim were performed by the Plaintiff, were considered "unacceptable" with regards to any other employees and that those employees were subjected to similar actions by the Defendant. Therefore, it can be concluded that the action taken against the Plaintiff was solely directed against him for the reasons the Plaintiff has articulated herein.

Respectfully Submitted

*/s/ John P. Bohne*

John P. Bohne
34 Kenmare Way
Rehoboth Beach, DE 19971
(302) 227-6405
(302) 448-0993 (mobile)

Dated This Day: 8/12/05

To:

Brigitte M. Duffy, Esq.
Seyfarth Shaw
Two Seaport Lane, Suite 300
Boston, MA 02210

### CERTIFICATION

I herby certify that the foregoing Motion was served upon Defendant's counsel of record above, this day August 12, 2005 via United States Postal Service Express Mail.