United States District Court
District of Massachusetts

John P. Bohne,  )
    Plaintiff,  )
  )
v.  )    C.A. No.04CV10068WGY
  )
Computer Associates  )
International, Inc.,  )
    Defendant.  )
  )
  )

## PLAINTIFF'S CORRECTION OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

      Pursuant to rule 56 of the Federal Rules of Civil Procedure and Local rule 56.1, Plaintiff John Bohne (Plaintiff or Bohne) submits the following objections or corrections to material facts. These will follow the sequence as presented by the defendant.

**Background**

    1.    No correction or changes.
    2.    No correction or changes.
    3.    The correct statement should read as follows: "CA compensated its Sales Executives with various types of individual compensation plans. These were recently called <u>Wealth Enabling Plan</u> and were subject to change at the beginning of each Fiscal Year. During Bohne's Fiscal Year 2002 employment, the <u>Wealth Enabling Plan</u> had various rates for New Product Licenses, Education Sales and Time and Capacity agreements. The quota attainment determined the Commission Rates." Refer to Exhibit #1.

1

4.   The correct Statement should Read as follows: " In conjunction with the Individual Plans set forth above, CA would issue a <u>Sales Compensation Plan</u> which served as a guide for the Sales Organization and established various procedures and rules to be followed for the award of Commissions. These were subject to change at the beginning of each Fiscal Year." Refer to Defense Exhibits 3, 4, 5, and 6.

5.   The Correct Statement Should Read as Follows: "Before making a formal sales proposal to a customer or potential customer, CA Sales Executives must complete and obtain approval of a Business Analysis Review Form (known at CA as the BARF). This BARF form is a Microsoft Excel worksheet and is circulated electronically via email for various approvals. Prior to the review and approval of the BARF by the Global Sales Organization ("GSO") and Legal Departments ("Legal"), copies of all affected License Agreements must provided to the respective departments. This was outlined in the Sales Plan for Fiscal Year 2002 and was strictly adhered to. The BARF is first reviewed by your manager and is forwarded to GSO. No Review of the BARF takes place until all of the above steps are followed. Once financial approval of the BARF is received from GSO, Legal reviews the proposed terms and conditions and prior License Agreements for potential conflicts."[1]

6.   The Correct statement should read as follows: On specific BARFS where individual transactions dictated, the information required in the "Cheat Sheet" should be provided. (Refer to Bohne Dep. Page # 76 and BARF Form shown as EXHIBIT 2).[2]

7.   The Correct Statement should read: "During CA's Fiscal Year of 2002, CA Sales Executives were ……..License Policies."

8.   No Corrections or changes.

9.   This paragraph should be stricken in its entirety. In fact, the Compensation Plan of April 2001 to March 2002 is silent on this subject of "payments owed to third parties". The plan was subsequently changed in April 2002 to reflect the approval of the CFO in FY 2003. Refer to exhibits 2 and 3. As previously stated, the BARF form does not provide for any place to reflect

---

[1] Refer to Bohne Dep. Page 137.
[2] It should be noted here that testified in the Deposition, the BARF document does not ask for or have any refinance to CA Expenditures.

      this information.[3] Because of this fact and due to the complexity of the financial Proposal, Bohne chose to attach the actual proposal that would be presented to the client as a part of the BARF spreadsheet. This was intentionally done to avoid any confusion as to actually what was approved by the Defendant versus what the client received as a proposal. Refer to Exhibit 2A.[4]

10.   No corrections or changes.

### The Allmerica Deal

11.   Correct to read as follows: "On March 19, 2002, Bohne submitted the revised BARF for the .........As attached as Exhibit 5.)"[5]
12.   No corrections or changes.
13.   Over the next week or so, Bohne submitted subsequent versions of the Allmerica BARF to Pilato. The terms of the deal were changed to reflect the removal of the certain products and to adjust the financial portion of the deal to reflect the changes that the client had made without prior approval of CA.
14.   No corrections or changes.
15.   Correct to read as follows: "Based upon the information in the BARF, copies of Existing License Agreements to be superseded, and the Order Form and proposed Addendum, the Allmerica deal received all necessary approvals by March 28, 2002. According to Bohne's final BARF, the Allmerica Deal was worth a gross value of $1.8 million...1054.)
16.   No corrections or changes.
17.   Correct to read as follows: "When CA's Sales Accounting Department enters information into CA's database, known as TOPS, it gives a unique supplement number to each product licensed. In the case of the Allmerica deal, CA designated the following numbers for separate product groups:.......1054)".
18.   Strike this paragraph its entirety and have it read as follows: "At the time of the March 2002 Deal, Allmerica still owed

---

[3] There is no reference in the testimony to payments owed or forgiven.
[4] Note the identical format of the proposal and the identification on the various pages in the BARF as "Proposal".
[5] Note that the dates on the documents that are printed reflect current dates. These were set up by me for use with this form while at CA. It is important to use the Plaintiff's version since it was printed on a color printer. The Defendant deliberately copies these on a black and white printer to hide important details.

money for the Netmaster, Aion, Endevor and Intertest for CICS products. Since the term for the Endevor and Intertest were greater than three years, GSO (Jennifer Pilato) insisted that they be removed from the Deal to conform with the current guidelines for this type of agreement. (Refer to the Page 15 of the Defendants Exhibit 8 and the same page in color on Plaintiff's Exhibit 5). All of the referenced payments were due to CA with the exception of the Aion which was to be paid to a third party finance company per the agreements that were sent to GSO and Legal. Reference to these facts was made on the Tab B of both BARF copies."[6]

19. The Business proposal presented to Allmerica suggested that CA would absorb the obligations for Aion and that CA would terminate the License for the Netmaster products and thus cancel out the payment obligations for that product. The Agreement, that was presented to CA, however did not reflect this fact, but instead read "....subject, however, to the obligations of Licensee (a) to pay all contracted payments when and as the same shall otherwise become due and payable but for such termination,....". Refer to exhibit 6, page CA 1083.[7]

20. No corrections or changes.[8]

21. Strike the paragraph in its entirety and replace with the following: "Bohne completed and submitted to Pilato Tab B of the BARF with Pilato's approval, since the financial aspects of the transaction did not fit the standard format of the BARF document and it was important that both the Defendant and the client receive identical information. The statement on Tab B included the following: "The precommitted payments for Endevor and Intertest will survive the agreement. The BAU (or "Business as Usual" a standard terminology used in these

---

[6] It is important to note here that the form used was an Excel Spread Sheet, which has, by design, the ability to display colors. The choice of RED was deliberate to follow standard accounting procedures of "Red Ink" reflecting a "loss" or negative amounts. This was done so that the notes and amounts in question would not be overlooked or over booked.

[7] This is a standard form of addendum used for many transactions of this type. The CA legal department prepared this document for use by the Sales Organization. It should be further noted, that under the "Statue of Fraud", that the signed agreement would take precedence over all written and oral communication made during the sales process.

[8] This is difficult to understand when the information was presented in RED, copies of the contract documents that were being superseded were provided to her and she was the individual that requested that the Endevor and Inertest for CICS be removed from the agreement because they had payments greater than 3 years.

4

transactions) includes the precommitted payment for Netmaster and Aion. Since those terms are less than 3 years and they will be upgraded as a result of this transaction."[9]

22. Strike the paragraph and replace with the Following: " No financial obligations were incurred as a result of the Allmerica Agreement. The value of the deal reflected on Bohne's Commission Statement was $1,443,043 not $1,800,000. Refer to tab 14, CA 1233 in Defendant's Documents filed under Seal.

**Bohne's Termination**

This section contains statements in the form of "Affidavits" that were made a part of this Motion even though the Plaintiff was not given an opportunity to be present during the taking of this information and did not have a chance to ask any questions regarding the information provided. The review and comments that follow will only challenge that for which the Plaintiff has direct knowledge of facts that are different.

23. No Comment.
24. No Comment.
25. It should more accurately read as the Deposition reflects.

> " *Q. And how did you blow the whistle?*[10]
> *A. Okay. Specifically it was with Allmerica by the way. It came to light when the client Larry DelBono specifically contacted me and said, oh, by the way, I still have – I just received an invoice from the Platinum Financing Company, I forget the name of the company, but it was Platinum's financing company, for $94,000 and he said to me weren't we supposed to include that in our deal? I researched my paperwork, my proposals and my BARF, and it came to light to my attention that the answer is yes, that was supposed to be including the deal. Okay. I brought that to the attention of Jean Shultz witnessed by Irene Salvatore.*"

---

[9] The term BAU refers to "Business as Usual" and was understood to mean that they would be included. Just as the first reference stated that, the Endevor and Intertest were excluded from this deal. The payments due for Aion are reflected on page 16 of the Defense Exhibit # 8 and 15 of #8. For color versions of these see the corresponding pages in Plaintiff's Exhibit 2. Please not the footnote about Endevor and Intertest on page 8.

[10] It is important to note here that the Accounting rules had changed holding the officers of the company liable for publicly filed financial data and the contract in question was reflected in the revenue for FY 2002.

> *"Q. And what did you say to her?*
>
> *A. I indicated to her that, you know, the client had just contacted me and reported that they had received an invoice for this $94,000, and I indicated to her that based on the information in the BARF that I had done, that that was supposed to have been included as part of the deal for Allmerica and that the client should not be obligated to pay that $94,000.*
>
> *Q. And what did she say? Did Irene Salvatore say anything?*
>
> *A. Irene was in the room at the time, and I don't believe she mentioned about it at the time. Irene is the Senior VP or was. I don't know what she does now.*
>
> *Q. But she didn't have any input in this conversation?*
>
> *A. She knew exactly what I was talking about though because she used to head up sales accounting at the time for many years. She was Jean's boss's boss.*
>
> *Q. When you said she knew exactly what I meant, what do you mean by that?*
>
> *A. Okay. Irene was an extremely capable individual. She was Jean Schultz's boss's boss. So when I indicated to Jean what I was concerned about, Irene fully comprehended, okay, my statements meaning that she knew when there was a finance thing, okay, that CA should have cut a check for $200,000 to get rid of this financial obligation and they never did.*
>
> *Q. But you're no saying that she knew any specifics about this particular deal, you're just saying she understood your point?*
>
> *A. She understood my point."*[11]

26.    It should more accurately read as the Deposition Reflects:

---

[11] The Deposition statement reflects the understanding by both the Plaintiff and Allmerica, that the contract document did not forgive these payments.

> *"A. Jean's initial reaction was, well, we probably didn't know about it. I went back and pulled a copy of my BARF because I was concerned that I might have made a mistake. In the BARF I found three notations to the reference that these payments were precommitted and should have been aken out of the deal."*

27. It should more accurately read as the Deposition Reflects:

   > *Q. Did you tell her the dollar amount at issue?*
   >
   > *A. No. Well, I shouldn't say that. I might have because I think I might have mentioned that the bill was like $95,000 that the client received. My next — about two days later I was finally able to get into my commission statement which, by the way, I could never print off, and I don't know whether you've even been able to get it into yourself. The darn system never seemed to work right. Okay. I had never actually received a formal commission statement for the month of March. It was never mailed to me. Okay. It was supposedly available on-line but I never got one, and I couldn't get into the system to view it. There were technical problems. I finally got into the commission system and realized that I never was paid at all on the Aion product line, that Tom Allessi was paid on it. Now I'm not sure why but somebody had authorized Tom Allessi who is the account manager responsible for new product sales, okay, and he would have sold the Aion if it were new product. Somebody managed to set up the commission so he got paid on it.*[12]

28. Replace with Deposition statement in 29.
29. No Comments.
30. No Comments.
31. This entire paragraph supports the "Whistle-Blower" charges. The reviewer was the individual the Plaintiff confronted about the "Over Booking" issue. There is no mention of a Legal review of the Agreements as to CA's liability for payments nor was there ever a discussion with the Plaintiff as to information in the Agreement, the BARF or Proposal presented to the Client. Furthermore, the individual that reviewed and approved the Allmeria BARF, Jennifer Pilato, was not mentioned as to her knowledge or understanding of the transaction. Refer to

---

[12] This is an important point. Since the Plaintiff did not receive or have access to any Commission data until this August, the "overbooking" was not realized until the client questioned the billing.

paragraph 18 for the correct information. There are two important issues that should be noted here:
   i. Four products were initially proposed to be included in the Allmerica Deal that had pre-committed payments. Endevor, Intertest for CICS, Aion and Netmaster were a part of the original BARF. Two of these were removed at the request of Pilato leaving only the Netmaster and Aion products in the Agreement. It was obvious that Pilato was aware of the Payment obligations of Allmerica. Refer to Exhibits #5 and #2.
   ii. There were three references in the BARF to these payments one on the Tab B and two in the details of the spreadsheet. The notations were in RED so that they would not be overlooked or "Over Booked". Refer to Exhibit #5.

32. This is an inaccurate statement for a member of the Accounting Department to make. It does not matter whether CA pays XYZ finance company or cancels payments owed to CA. Both reduce the GAAP value of the transaction. The GAAP value of Allmerica was overstated. Both the Netmaster obligations and the Aion obligations should have been accounted for. Only the Netmaster was cancelled. Refer to the attached Exhibit #6 CA1077 and CA1088.
In the last sentence of this paragraph, the Defendant contradicts earlier statements made in paragraph 19 and 20.

33. Please see above.

34. There is no mention here that the Defendant reported this fact to the SEC as is required. In fact CA has only recently adjusted its financial reports to reflect the "Over Booking" situations that occurred in this time period. Refer to SEC Filings that are a matter of Public Record to support this statement.

35. It is important to note here, the fact Arato was the assigned Attorney responsible for the Legal review of the Contracts and Documents relating to the Allmerica Deal

36. The correct statement here should be: "Computer Associates terminated more that twenty employees of the Framingham Office for apparent misdeeds. No legal action has ever been taken against any one terminated including civil actions to recover of supposed "unearned Commissions".

37. Sanjay Kumar, Stephen Richards and Stephen Woghin (Mr. Woghin was the former Chief Counsel for The defendant and Mr. Arato reported to him either directly or indirectly at the time) are all indicated in a SEC Litigation Action NO. 18891/September 22, 2004. Mr. Woghin has admitted to some wrongdoing. Refer to Exhibit #7. Although Kumar and Richards have pleaded innocent in Federal Court and the trials are pending, Upwards of four of the Defendant's former officers have accepted responsibility for wrongdoing. This further supports the "Whistle blowing" charges in the Plaintiff's Motion since they were directly involved in the decision to terminate the Defendant for reporting the "over-booking".
38. See Above.
39. See Above.
40. See Above.
41. It should be noted here that nowhere in the Defendant's own statement did the Defendant try to confer with, question, or even bring to the attention of the Plaintiff, the issues relating to Allmerica. Further, the defendant was never questioned, reprimanded or challenged on any License Agreement sold during his tenure of 19+ years with the Defendant. These agreements amounted to about $150,000,000 of new revenue to the Defendant. Refer to exhibit #8.
42. No Comments.
43. This is the basis for this action against the Defendant. Attached is a "Law Report" produced by the Defendant's Attorneys, Seyfarth Shaw. In it, it states the criteria for Age discrimination regarding a district sales manager who was terminated for violation of Company Policy and although there was no violation of CA's policy here, this case mirrors the one brought to the attention of this Court by this document. These are quotes from the article: "In order to establish a claim of age discrimination, the employee generally must show----at a minimum-----that he or she: (1). is over 40 years old; (2). had performed his/her job at an acceptable level; (3). was terminated; (4). was replaced by a younger person." Refer to Exhibit 9.
Sections (1) and (3) are not disputed by the Defendant. Section (2) has been discussed in Paragraph #41 and throughout this Motion.

### Bohne's Allegations

A. **The Allmerica BARF**

44. This statement is incorrect in the following ways:

   i. As was previously stated, only the Aion product was billed to the client by a third party finance company. The Netmaster product was billed directly by CA on a license agreement that was sold by the Plaintiff in December 2001.
   ii. There were three places in the BARF document where the commitments were referenced. Two of those in RED.

45. This Statement should Read as follows: "First, Bohne contends that his statement on Tab B of the BARF coupled with the events that led to the approval of the Allmerica deal, was sufficient disclosure of this term. Those events include (1) the furnishing of copies of all agreements that were to be superseded to GSO and Legal. (2) Adding the statement on the Tab B that more correctly reads *"The client currently has CPU based Licenses and wishes to go to a MIPS based license. The Pre-commited payments for Endevor and Intertest will survive the agreement. The BARF includes the Pre-commited Payment for Netmaster and Aion. Since those terms are less than three years and they will be upgraded as a result of this transaction."*. Note here that the earlier copies of the BARF included the Endevor and Intertest products, but these were removed at the insistence of GSO (Pilato). This reflects that there was knowledge of the terms of the agreements being superseded. And, (3) clear notations on the BARF that payments were remaining on those agreements. These notations were deliberately reflected in RED so that they would not be overlooked during the booking and approval processes.

46. The only comment here is that Exhibits 2 and 5 should be used since they have the colored text.

47. This is a very inaccurate statement. The very fact that "Red Ink" was chosen is a standard method of indicating a negative amount. Furthermore, the there is a clear notation on the Booking Paperwork (refer to Tab 12 CA1088) which states:

10

"Please note supplements 1015403-003 and 04 were included in the pricing of the new agreement per the BARF (Netmaster products)". This is reflective of the fact that the notations in RED had been understood by the individual that prepared this document. However, the Defendant only credited the amounts owed for the Netmaster products and did not pay off the finance company as was required.

48.  This is addressed above.

### B. Commissions on Allmerica Deal

49.  The commission statement presented by the Defendant clearly supports the position that the Plaintiff was not commissioned on the full value of the Allmerica deal. The Agreement was for $1,800,000 and the Commission statement reflects a value of $1,443,043. Refer to Defendants tab 14, CA1233. Furthermore, the Defendant repeatedly refers to "commitment that he made on CA's behalf" and has not shown any documentation that supports that statement.

50.  No Comments.

### i. CA did not treat any portion of the Allmerica Deal as new product.

51.  This is incorrect. Refer to the commission statement. Furthermore, per the Compensation Plan, each Sales Executive was authorized to sell licenses for various products to prospects and clients. The MF (Also called OS/390) Group, of which the Plaintiff was a member, had responsibility for all revenue associated with the conversion of a clients licenses to a MIPS based license. The IM (Information Management) Group was responsible to market new licenses of their product group to those same clients. The Aion product was the only product in the agreement that was on the list of IM products. Therefore, the notes referenced are either mistakes or deliberate acts to cover up the fact that the agreement was "overbooked" and new products were reflected as being sold to this client. Refer to Appendix C of the Sales Plan in Exhibit 3.

52.  Since this agreement was to convert existing licenses to MIPS licenses, and no one other than the Plaintiff has accepted

11

responsibility for the agreement, it is unclear why anyone else should be commissioned on this deal at all. The only other explanation supports the Plaintiff's claim for "Age Discrimination" since the Sales Executive in question was younger than the Plaintiff and this would be "unfair treatment" of the Plaintiff by the Defendant.

### ii. CA commissioned Bohne on the Aion product.

53. This was reasonable, since, that was the only product that he was authorized to market and sell to Allmerica that was covered by the agreement. Furthermore, Allessi's commission statement does not reflect commissions awarded on any of the three supplements recorded in the agreement. In fact he was commissioned on 0598868a17. The amount of the award matches the amount owed to the finance company by CA.
54. That is not reflected in the Documents presented by the Defendant.
55. There are numerous products covered by that supplement. Without a complete breakdown by product, that statement cannot be verified. Recall here that the commission for the Deal was almost $400,000 less than the contracted value.

### C. Whistle Blowing

56. The Sarbanes-Oxley act does not require that the "Whistleblower" have knowledge that he/she is a "Whistleblower" at the time the irregularity is reported to the appropriate individuals. It protects that individual from retaliation as a result of such reporting. The Plaintiff reported the irregularity to a member of the financial organization in the presence of a Senior Vice President of Computer Associates (Irene Salvatore). See Bohne Deposition page 169-170.
57. No Comments.
58. The Plaintiff is not attempting to place the full blame on Josh Glas who is an accounting clerk. The Plaintiff is stating that there was an obligation to a third party regarding Aion that would have been apparent when the BARF was reviewed and the credits were issued for Netmaster. Recall here that the Netmaster product was not financed through the third party but

was duly noted with Aion product as having "pre-committed" money owed. These should have been credited along with the payment for Aion to the third party. As a result of this, CA overbooked this deal and recognized greater revenue in its FY 2002 year. Refer to Exhibit #10.
59. Refer to Exhibit 6, CA1088
60. No comments.
61. No comments.
62. Again, the Netmaster product was not paid to a third party.
63. This is completely inaccurate. The agreement in question was for three payments that included License fee's and Usage and Maintenance for a three-year term. All of this information is stored on the CA database record that was cancelled by accounting.
64. The notes are clear. There is no Affidavit from Josh Glas referenced in this Motion to support any of these statements. The only statements are from Shultz who has made numerous errors in her Affidavit and did not have any direct knowledge of the facts as presented during the initial review and approval process.

D. **Bohne's Commission Claims**

65. No Comments.
66. The correct statement here is "Bohne understands the reason **CA says** it did not pay him.......Termination." There was no acknowledgement that this was a valid reason. In fact, it was not unreasonable to expect that commissions due, were to be paid once the payment was received per the terms in the agreement. No such payment of commissions has occurred.
67. This is in conflict with Massachusetts law and was not agreed to by the Plaintiff. (Bohne Dep., 281, 342-45)
68. No comments.
69. No comments.
70. No comments.
71. No comments.
72. No comments

E. **Bohne's Age Discrimination Claim**

73. No comments.
74. No comments.
75. This is incorrect. It should read as follows: "Bohne bases his age discrimination claim on the fact that the Defendant violated Massachusetts Law regarding a protected class of worker. The Plaintiff was a member of that class and was terminated. The Plaintiff further claims that the termination was not the only instance of discrimination against the Plaintiff, but, the Defendant had a practiced various forms of discrimination for years prior to the termination. (Bohne Dep., 192-93:196-97:201-02:335-36.)
76. No comments.
77. This is not true. The notes kept by the Plaintiff were handwritten and dated. There has not been any testimony, affidavits or other documents introduced by the Defendant to question their authenticity. Furthermore, the position taken by the Plaintiff is that the discrimination involved, was specifically directed toward the Plaintiff and may have applied to others in that protected class. This Motion is not intended to represent all of the others within the Defendants employ that may have been discriminated against.
78. No comments.
79. No comments.
80. Again, the Plaintiff maintained notes and other documents taken over the years of his employ. These are not the sole basis of this claim. These were introduced by the Defendant during the taking of statements from the Plaintiff and serve to support the fact that there was a practice of age discrimination that existed years before the Defendants illegal actions of August 2002.

14

Respectfully Submitted

*[signature]*

John P. Bohne
34 Kenmare Way
Rehoboth Beach, DE 19971
(302) 227-6405
(302) 448-0993 (mobile)

Dated This Day: 8/12/05

To:

Brigitte M. Duffy, Esq.
Seyfarth Shaw
Two Seaport Lane, Suite 300
Boston, MA 02210

### CERTIFICATION

I herby certify that the foregoing Objection was served upon Defendant's counsel of record above, this day August 12, 2005 via United States Postal Service Express Mail.

15