**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| John P. Bohne,<br>    Plaintiff,<br><br>v.<br><br>Computer Associates<br>International, Inc.,<br>    Defendant. | C.A. No.04CV10068WGY |

**PLAINTIFF JOHN P. BOHNE'S REPLY TO DEFENDANT'S REPLY TO MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

In an attempt to support its position for the Summary Judgment in favor of Computer Associates International, Inc. (Defendant), the Defendant has incorrectly stated facts, failed to provide any evidentiary support documents other than those already refuted by the Plaintiff and has not properly addressed the applicability of law concerning the complaint of the Plaintiff, John Bohne (Plaintiff). The Plaintiff will restate its position and make the appropriate corrections herewith.

**ARGUMENT**

    I.    **The Plaintiff's Statutory Claims Would Survive.**

           **A. Sarbanes-Oxley**

1

The Defendant did not provide any reason for the Plaintiff's termination until January 2003.[1] This would have made it impossible to comply with the Statute Of Limitations as imposed by the regulation. Since there was never a reason given for the termination until the January letter it was impossible to provide any proof to the Secretary of Labor regarding the actions of the Defendant. The Regulation, however, does not preclude an employee from seeking Compensatory Damages per 18 U.S.C. Paragraph 1514 (d) of the regulation, which reads as follows:

"*(d) **Rights retained by Employee**. - Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law, or under any collective bargaining agreement.*" .

Since there is a clear motive associated with Defendant's actions and the Defendant failed to respond in a timely manner to repeated attempts to secure the information regarding the Plaintiff's termination, one could deduced that this was an effort to prevent compliance with the Statute Of Limitations provisions of the Act by the Plaintiff. However, this civil action would replace the rights and remedies offered in the **Sarbanes-Oxley** regulation.[2]

B.   M.G.L. c. 149, Section 148

The Defendant attempts here to suggest that there was a failure by the Plaintiff to comply with the provision of this act requiring that a claim be filed with the Attorney General within ninety days of the violation. In fact the responsibility to file a claim with the Attorney Generals Office within ninety days did not become effective until September 8, 2004 and therefore would not have applied to the

---

[1] Refer to Plaintiff's exhibits 13, 14 and 15.
[2] It should be recalled here that the author of the letter was an Attorney with the Defendant.

Plaintiff since the Plaintiff's violation occurred in August 2002. (**M.G.L. c. 149, Section 150**).

C.     **Breach of Covenant of Good Faith And Fair Dealing**

There is "a general assumption of the law of contracts that people will act in good faith and deal fairly without breaking their word, using shifty means to avoid obligations". (Refer to attachment A). The very fact that the defendant chose to terminate the Plaintiff (an employee with over 19 years of exemplary service to the Defendant) without any justification or notice and then employ those same "shifty means" to avoid the payment of commissions that were owed to the Plaintiff, provides the substantiation for this charge. The Defendant deliberately utilized a technicality within the Defendant's Sales Plan to justify withholding the payments of over $160,000 in commissions for various transactions not in dispute here. All of these commission payments were to be paid to the Plaintiff within days of the termination. This was clearly done with malice and for the "Personal Enrichment" of the Defendant.

II.    **Plaintiff's Claims are Supported by Facts not Refuted by the Defendant.**

The Defendant continues to present only one defense as to their illegal actions, namely the Allmerica License agreement accepted by the Defendant in March of 2002. They continue to hold the position that an offer from Allmerica to license certain products from the Defendant as accepted by the Defendant was the justification for the termination of employment of the Plaintiff even thought the

3

Plaintiff had a 19 year unblemished record with that employer. They fail in any way to refute the following facts introduced by the Plaintiff.

1. The Plaintiff was 58 years of age in August 2002
2. The Plaintiff was terminated.
3. The Plaintiff was replaced by an individual that was younger and less experienced than the Plaintiff.

The Defendant relies solely on the defense that the "the Plaintiff had **_not_** performed his or her job at an acceptable level". The Defendant is not basing its claim on any documented notices, warnings or reprimands issued to the Plaintiff, but on one transaction that at best, could have been mistakenly interpreted by the Defendant. The evidence clearly supports the position of the Plaintiff that every reasonable effort was made to clearly identify material aspects of the transaction to both the Defendant and to the Client Allmerica. The very fact that the same document that was used for approvals within the Defendant's Sales Management, Accounting, and Legal Departments, was also used as the Proposal to Allmerica demonstrates that fact. The Defendant fails to provide any motive for the Plaintiff's "conduct" and has not refuted facts relating to the circumstances of "Whistle-Blowing" when the Plaintiff reported the "overbooking" to senior members of the Finance Department and instead relies on the statement that the "overbooking of revenue" was not significant and therefore was not reported to the SEC. The Sarbanes-Oxley Act does not establish any thresholds that would exempt the Defendant from filing this adjustment to its financial statements.

4

### A.. Misconduct By CA's Senior Executives is Relevant.

The fact that Sanjay Kumar and Stephen Richards were both involved in the decision to terminate the Plaintiff and even though Richards provided the direct order as per the Defendant's own statement, their respective motives were clear. The Sarbanes-Oxley act became effective in 2002. This act provided penalties for actions relating to Financial Disclosure for Kumar and Richards. The Allmerica transaction could have exposed them to the "overbooking" situation. By terminating the Plaintiff, there was an attempt to shift responsibility for the "overbooking" to the Plaintiff and cover up their own actions.

### A. Plaintiff's Allegations and Rebuttal to Defendant's Statements Regarding Its Reason for Terminating Plaintiff's Employment.

The Plaintiff has continually presented documents and facts the clearly support its position that every reasonable effort was made to reflect all aspects of the Allmerica transaction. A summary review of those facts follows:

1. Three notations in the approval document (the BARF) reflected "Pre-Committed" payments. Two of these were deliberately reflected in RED so that they would not be over looked or "overbooked". There were clear spreadsheet notations as to remaining payments. These were in RED.
2. The Netmaster product was cancelled and replaced by the agreement and payments were credited. The defendant had misstated that this was financed

with a third party in the original Motion.[3] This very action should have triggered the same credit for the Aion product since both products were identified in the same way in the BARF. That credit would have been the payment to the third party Finance company. In fact, no payments were made on behalf of Allmerica to the Finance company until the situation was reported by the Plaintiff.

3. The Defendant has consistently taken the position that there was not a clear understanding of the transaction by GSO (Jennifer Pilato) and Legal even though copies of contracts were furnished, Business Analysis Review Form (BARF) documents were circulated, and the same document that was used for the Proposal was also used for the BARF. Although the Plaintiff cannot produce the actual BARF, which included the Intertest and Endeavor products, a copy of an email to Jennifer Pilato dated March 4, 2002 with a spreadsheet attached confirms that she received and read the document. That email and spread sheet (Exhibits C and D) confirm that the Defendant had full knowledge of financial commitments that were owed by Allmerica two weeks prior to the final BARF being submitted and advise was sought by the Plaintiff as to how these were to be handled in a proposed agreement for Allmerica.

The Defendant continues to argue the merits of its defensive position on the Allmerica Deal and completely overlooks certain key facts relating to the Plaintiff's claim. For Instance,

---

[3] Refer to paragraph 18,19,and 20 of the Defendants original Motion..

- The Defendant has not produced any evidentiary support documents to refute any part of the Plaintiff's claim with regards to third party payments even though those documents are in the possession of the Defendant. Furthermore, the Defendant misses the relevant issue here, namely, that the responsibility shifts to the **Defendant** to prove "just cause" for its actions in terminating a protected "class" of employee[4]. They have completely failed in their attempts here.

- The Plaintiff had refuted the fact that there was a financial obligation incurred on the part of the Defendant as a result of the Allmerica Deal. The facts stand for themselves. The value of the Allmerica contract was $1,800,000. There is no documentary evidence as to why the commission was only $1,442,043. The only thing that is stated here is that the Defendant could adjust the value of the deal down based on some "present value" calculation. Nowhere are those calculations shown or validated. Furthermore, the Defendant has admitted that some portion of the Allmerica transaction was "transferred" to a Sales Executive named Tom Alessi. *It should be recalled here that there has been much time and effort spent to reinforce the fact that all transactions need to be justified with a BARF. The Defendant provides the Plaintiff with additional support on the claim of "Age Discrimination" by selectively enforcing that rule. If you are Tom Alessi, for example, you can be paid for an undocumented transaction.*

---

[4] "Under Law 100, a plaintiff establishes a prima facie case of age discrimination by (1) demonstrating that he was actually or constructively discharged, and (2) alleging that the decision was discriminatory. Id. If this minimal showing is made, the burden shifts to the employer to prove by a preponderance of the evidence that it had "just cause" for its actions".

7

> *There has been no justification, document or any purported reason given by the Defendant for the "transfer" of money to Tom Alessi. The only reason supports the Plaintiff's case on Age Discrimination since Tom Alessi is younger than the Plaintiff and there is a dual standard applied for rules enforcement* . Furthermore, the Defendant relies on a commission statement as "proof" that payment was made to the Plaintiff on the Aion product. This document has been shown to be unreliable and can be manipulated by the defendant for any purpose[5]. The statement in question does not reflect payment on Aion, but a group of products.

- Here the Defendant makes a vein attempt, through a technicality, to disguise the fact that GSO (Jennifer Pilato) was made aware of the commitments for Intertest and Endeavor along with Aion and Netmaster via an email that was received and read on March 4, 2002. This was not a BARF. It was, however, the exact format as the subsequent BARF documents. In this email and spread sheet the Intertest and Endeavor products are discussed as to commitments greater than three years. For this reason, when the BARF document was prepared the Intertest and Endeavor products were removed from the document and the Proposal. In addition for purposes of clarity, the following notation was included in the BARF: *"The client currently has CPU based Licenses and wishes to go to a MIPS based license. The Pre-committed payments for Endeavor and Intertest will survive the*

---

[5] Refer to the Tab 14 and 15 of the Defendant's Exhibits marked for Impound. In the Commission statement for Tom Alessi, a bogus account record is used to support payment of commissions. That record is 0598868a17. Please note here that there is no other contract number formatted like that and that would not follow the Data Base Standard numbering system.

> *agreement. The BARF includes the Pre-committed Payment for Netmaster and Aion. Since those terms are less than three years and they will be upgraded as a result of this transaction.".*

The defendant continues their deception by attempting here to misrepresent facts and statements made by the Plaintiff. Nowhere on any document available to the Plaintiff, did the value of the Allmerica Deal appear as $1.8 Million. The contracted payments totaled $1.8 Million. In fact the email trail from the Plaintiff (Refer to exhibit 6, CA 1069 through 1073) to all parties involved reflects $1.7 million when the initial approval was for a payment stream of $1,882,967 as reflected in the email from Jennifer Pilato. *This clearly reflects an attempt on the part of the Plaintiff to again highlight that payments were owed by Allmerica. The difference approximated the amount due to the third party Finance company.* The line on the email was an informational line and could not accurately reflect "buy down" amounts from finance companies. As a matter of record, the only reference to $1.8 million is on a document created by accounting and Jennifer Pilato in an email approving the final BARF.

In its final point, the Defendant makes an attempt to cover earlier inaccuracies, namely, that there were commitments made by the Plaintiff that obligated the Defendant to make payments to a third party. This fact has been refuted repeatedly by the Plaintiff. Now the defendant attempts to reverse those facts in some way by implying that the responsibility for the preparation of the contracts rests with the Sales Department and not with the Legal Department staffed with

Para-Legal personnel as well as Attorneys. Again, the argument fails. The purported purpose for sending the BARF and suggested terms to GSO and to Legal prior to presenting them to a Client was to insure that the terms matched the BARF and Proposal as well as to insure that there were no conflicts with prior agreements. It was for this reason that all prior agreements were to be faxed to both Legal as well as GSO. The expectation was that both GSO and Legal would make the appropriate changes. Please note the changes and dialog between Jennifer Pilato (GSO) and Kelley Curley (Para-Legal) (Plaintiff Exhibit 6, CA 1072 and CA 1073) where changes were made or suggested. This clearly demonstrates that these individuals were responsible for, and did make changes to, published documents to insure that they matched the transaction being proposed. Furthermore, Alexander Arato, the Attorney that oversaw the Legal aspects of the Allmerica Deal, was copied, via email, on this entire dialog. The Defendant's argument also fails here, since they have not refuted the fact that the payments for Netmaster were cancelled, reflecting the fact that the Defendant did understand the prior license agreements were to be cancelled and superseded both for terms as well as payment obligations. The only point being made by the Plaintiff in the reply, was that there were no underlying financial commitments made by the Plaintiff as was charged by the Defendant.

C.  **Discrimination Claim**

The Defendant argues here that the Discriminatory action of prior managers should not enter into the fact that the Plaintiff was discriminated

against. This argument fails, since this action was not brought solely to rectify an injustice, which occurred as a result of the Defendant's decision to terminate the Plaintiff, but to seek compensation for years of discriminatory actions by the Defendant directed toward the Plaintiff. The fact that none of those individuals indicated in the Deposition were involved in the termination is not material to the Plaintiff's case. In fact none of the individuals that were identified, are currently employed by the Defendant. Steven Richards' participation in the termination, was the direct result of the fact that all of the Plaintiff's immediate supervisors (Kim Livolsi, Sales Manager, Dan Tunnel, Regional Vice President and Jon Botter, Senior Vice President ) had been terminated the prior month leaving only Richards himself to effect the termination.

## CONCLUSION

The Plaintiff has provided clear substantiation to its charges and respectfully requests that the Court reject the Defendant's Motion for Summary Judgment.

Respectfully Submitted

John P. Bohne
34 Kenmare Way
Rehoboth Beach, DE 19971
(302) 227-6405
(302) 448-0993 (mobile)

**Dated This Day:** Sept 9, 2005

**To:**

Brigitte M. Duffy, Esq.
Seyfarth Shaw
Two Seaport Lane, Suite 300
Boston, MA 02210

### *CERTIFICATION*

I herby certify that the foregoing Reply was served upon Defendant's counsel of record above, this day Sept 9, 2005 via United States Postal Service Express Mail.