## United States District Court
## District of Massachusetts

| | |
|---|---|
| John P. Bohne,<br>      Plaintiff, | )<br>)<br>) |
| v. | )    C.A. No.04CV10068WGY<br>) |
| Computer Associates<br>International, Inc.,<br>      Defendant. | )<br>)<br>)<br>)<br>) |

### Statement of Facts not in Dispute

I am a sixty two year old and married father of four children. I was a resident of Massachusetts for over 20 years. I currently reside in Rehoboth Beach, Delaware. I attended St. John's University were I received a Bachelor of Science degree in Physics and a minor in Mathematics.

Through the date of my alleged termination on August 19, 2002, I was a hard-working, loyal and valued employee of the Computer Associates. I regularly performed in a superior manner, consistently meeting sales goals, and providing leadership and help to newer less experienced Sales Executives during my 19-year tenure. During this 19-year tenure, I was repeatedly recognized for accomplishments in Sales. I was responsible for over $150,000,000 in new license revenue and was awarded Compass Club trips (Achieving Quota Goals or better) on eleven individual occasions. My awards include "Second Runner up in the World" as an Account Manager. As a Divisional Manager, I was awarded "Region of the Year-Fourth Place", Region of

the Year-Second Place and I received many similar awards over the years. Most recently, I was awarded First Place among hundreds of eligible Sales Executives in the North East, at a mid year Sales Meeting in October 2000. My employment reviews over the years consistently ranked me in the "Top 1/3" of all divisional employees and I was granted Stock Options as a reward for this performance. I achieved an average "Quota Attainment" of about 229% over this 19-year tenure. (Refer to Exhibit 1).

In February of 1983, I joined Computer Associates as part of a Sales Training Program. At the completion of this program, I was assigned to a Sales Territory as an Account Manager.. From April 1983 until March of 1985, I was responsible for a new product line to be sold to Fortune 1000 companies located in Connecticut and New Jersey.  Computer Associates had a limited account base in either state for this product line. Within my first year as an Account Manager, I achieved over 100% of quota, placing 10th overall nationally, out of 100 Account Managers, and 3rd nationally against other product line managers.  In my second year in this position, I achieved 180% of quota, placing 3rd overall nationally, out of 150 Account Managers, and 2nd nationally in my product line.

In 1985, I was promoted to District Manager and transferred to Massachusetts. Here I was initially responsible for all sales activities in New England and upstate New York.  In this role, I managed a sales organization of Sixteen people consisting of Sales, Technical and Administrative staff.  Again, I embraced the challenges of a new position and I excelled.  For example, in 1985-86, I achieved 106% of the District's quota, in 1987-88; I achieved 135% of quota, in 1988-89 and ranked no. 1 in the Northeast Division. During the period 1990 and 1994, I served in various sales rolls as assigned by Computer Associates.

In 1994, I was promoted to the roll of National Account Manager, and Subsequently to Senior National Account Manager. In this capacity, I was responsible for major accounts such as Aetna, Cigna, Kodak, Dunn & Bradstreet, just to name a few of these Fortune 500 type accounts. During my tenure as a National Account Manager, I was responsible for securing multi-million

dollar agreements with these major accounts. While in this role, I consistently ranked at the top of the divisional sales organization and met quota two out of four years averaging 144% for all four years in that position. My quota varied from $10 Million in 1994 to $50 Million in 1997.

In 1998, I became a Sales Executive and in this role had complete account responsibility for major IBM mainframe accounts in New England, such as National Grid, and Allmerica. While a Sales Executive, I consistently ranked in the top 25% of my piers. As a Sales Executive in the year 2000, I was awarded the 1st place for year to date Quota achievement mentioned earlier. I achieved 138% of my quota by booking $16.5 million in revenue that Fiscal year, despite the fact that my individual quota was the highest in the region. With the booking of the National Grid deal in July of 2002, my year to date quota achievement was 176%. My sales skills and performance consistently placed me at the forefront of all my piers.

### Termination

In light of my outstanding job performance and considerable sales experience, coupled with my proven track record, the abrupt verbal notice of the Defendants intention to terminate me was not only surprising, but very troubling when the chronology of events preceding this termination are placed in context.

On July 19, 2002, CA terminated the Regional Manager for New England along with all but one of the Sales Managers and 8-10 Sales Executives in the Framingham office where I worked. These individuals were purportedly terminated for a fraudulent commission scheme. It is interesting to point out here that no criminal or civil actions related to this scheme have ever been sought by the Computer Associates.

On August 19, 2002, about a month after this action, I was walking to a company event and I was encountered by Juanita Cox, the Employee Relations Specialist for the office. During this brief encounter, Ms. Cox informed me that "I was being terminated", however, never provided any written notice of the termination. Understandably shocked,

I asked why I should be terminated. Ms. Cox replied a "rules violation" and refused to elaborate further.

**Liability**

The actions of Computer Associates as discussed herein support findings of Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing. The undisputed facts clearly establish a prima facie case of Breach of the Covenant of Good Faith and Fair Dealing as well as Breach of Contract. This conclusion is inescapable in light of (1) the fact that at the time of my alleged discharge, I was owed significant commissions that CA was aware of and fully understood were due to be paid within days of this termination; (2) that I brought to CA's attention the fact that a Contract was overbooked and by their own testimony, the individuals involved in approving the Deal were the same ones that urged I be terminated even though I had an unblemished record at Computer Associates.

**I.    Breach of the Covenant of Good Faith and Fair Dealing**

As to the covenant of good faith and fair dealing, Massachusetts recognizes that an employer may not, in every instance, terminate without liability, an employment contract which is terminable at will. Fortune, 373 Mass. at 104-105. As stated in the Fortune case, an employment at-will contract "contains an implied covenant of good faith and fair dealing, and a termination not made in good faith constitutes a breach of contract." Fortune, *373 Mass. at 101, 364 N.E.2d at 1251*. However, the mere absence of good cause to discharge an employee, while tending to negate the existence of good faith, does not by itself give rise to an enforceable claim for breach of the covenant of good faith and fair dealing. Gram v. Liberty Mutual Insurance Company *429*

4

*N.E.2d at 28.* Nevertheless, under Massachusetts law, where an employee is discharged without good cause, the obligation of good faith and fair dealing imposed on an employer makes the employer liable to the employee for the loss of compensation related to the employee's past services. Cort v. Bristol-Myers Company, *431 N.E.2d 908, 910 (1982)*; Fair dealing, the other aspect of the obligation imposed on an at-will employer, requires recognition of the agreed worth of such an employee's past services. Gram, 429 N.E.2d at 29.

## II.   Breach of Contract

Massachusetts law assumes at-will employment, unless there exists, expressly or impliedly, a contract governing the terms and conditions of employment. The Court should refer to Derrig v. Wal-Mart Stores, Inc., *942 F.Supp. 49, 54 (D.Mass.1996).* There are decisions in other jurisdictions that support this position as well, Monge v. Beebee Rubber Co., *316 A.2d 549, 552 (1974).* Here the New Hampshire Supreme Court held that all employment contracts, whether at will or for a definite term, the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two thus a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not the best interest of the economic system or the public good and constitutes a breach of the employment contract. Moreover, while an employee at-will may be terminated by an employer without notice, for any reason or for no reason at all, Upton v. JWP Businessland, *682 N.E.2d 1357 (1997),* there are well recognized limitations on an employer's right to terminate an employment at-will. Under Massachusetts law, an employer cannot terminate an employee if it violates the Covenant of Good Faith and Fair Dealing, Fortune v. National Cash Register Co., *364 N.E.2d 1251 (1977,* For the reasons discussed herein, I submit that I have claims against

Computer Associates for Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing.

### 1. Plaintiff's Concise Summary of Evidence

I will accept the statute of limitations on commissions prior to 1999 and concentrate on commissions due for the following transactions:

**Starwood Hotels:** This commission claim is based on the applicability of a sales contest that was in effect at the time of the booking (or correct booking) of the Starwood transaction. The Starwood amendment was submitted to GSO for approval in August 1999 and was the BARF was approved that month. Draft agreements were sent to Starwood and were being considered during the month of September. I was approached by Robert Whirley the Senior Vice-President of New England and I was asked would it be possible to get the Starwood deal signed now, even though the it was October. I responded that I would try and on **October 8th**. I received notice from Starwood that I could pick up the signed paperwork. I submitted it to CA on or about that date. I was advised upon submission of the agreement, that although I had all approvals, there was an error in the products and one of them had to be removed. I was requested to redo all of the agreements and resubmit them to Starwood. I did so with the date of October 31, 1999 since this was when the agreement would be signed. During the month of October, there was an announcement of a Sales contest. All of the agreements (the original deal and revised deal) were signed and delivered to CA during the contest period.

**National Life:** In June 2000, I brought to CA a large transaction from National Life of Vermont. In January of 2001, I brought to the attention of the Defendant that they had overlooked payments to a third party finance organization and that the customer had been billed for them. Everyone agreed that the error was on the part of the CA accounting group, however, they also stated that as result they had "over paid me commission". The reduction in value of the deal was about $118,710, however, the Defendant used that information to charge me back commission payments of $45,000 due to provisions in the plan involved. In December 2001, I

6

navigated the cash buy out of this agreement. I fully understood that this may not be commissionable, but, for the best interests of the Defendant I did it. The resultant agreement and payment revised the value of the original deal (the present value increased) and I sought reimbursement of the back off.. I was never compensated.

**National Grid:** This transaction and the resultant actions brought by the Defendant are the grounds for this action. The following are facts supported by email correspondence relating to this transaction:

1. The final value of the deal was $5,000.000.

2. Of that figure, $2,787,000 was reflected as newly Licensed Programs on one amendment and $2,213,000 of additional capacity licenses (additional MIPS).

3. These were covered in a BARF (approval form) prepared by me and approved by Finance, Legal, and Sales.

4. No other Sales Executive in the OS/390 group was involved in the transaction and no visits to National Grid were ever recorded on the Sales system (CAPS system to record sales activity at accounts for reporting to clients) other than for me.

5. The first reference to "splits" and "product transfers" occurred after the deal was signed, approved and booked not during the approval and signature process. This was an obvious attempt to limit or avoid payment of commissions.

6. Based on the above, the actual calculation of commission and bonus due for this deal is $193,685.85.

**Facts Established By Pleadings or Stipulation.** Plaintiff would stipulate to the following facts:

- Plaintiff was employed with CA in various sales capacities from 1983 until August 19, 2002.

- CA applied a multiplier to commissions on deals "received by CA and put into the system" during the third quarter of the 2000 fiscal year.

- The Sales Compensation Plan in effect from April 1, 2002 to March 31, 2003, provided that in cases where a Sales Executive's employment ended: ". . . Commission will be paid on an 'incomplete' transaction if the only open condition is CA's receipt of payment and that payment is actually received by CA within 30 calendars following the employee's termination or resignation.", provided that such termination or resignation were in writing.

- Bohne was the Sales Executive who handled a deal entered into by National Grid and CA in July 2002.

- CA received full payment for the National Grid transaction.

**Contested Issues of Fact**

a.  Did the Newly Licensed Programs for National Grid deserve to be commissioned as such.

b.  Did any other Sales Executive deserve to be commissioned for this transaction.

c.  Was the Defendant justified in "backing off" commissions for National Life and should they have been restored once the value of the deal changed..

d.  Should an agreement that was signed and in a Contest month qualify for contest Commissioning.

**Jurisdictional Questions.**

None.

**Questions Raised by Pending Motions.**

None.

**Issues of Law**

None. The claims for commissions prior to 1999 have been dropped.

**Requested Amendments to Pleadings.**

The Plaintiff wishes to amend this action to include damages for "Defamation of Character" which resulted from the actions of the Defendant. The Plaintiff's motives and

timing of the purported termination damaged the Plaintiff, forced the Plaintiff to seek employment in fields other than the Software industry and subjected the Plaintiff to severe emotional stress and financial hardship.

**Additional Matters.**

    None at this time.

**Probable Length of Trial.**

    Two to three days.

**Plaintiff's Witness List.**

Plaintiff does not intend to introduce testimony of any of its witnesses through depositions testimony.

| Name | Address/phone | Purpose of Testimony |
|---|---|---|
| John Bohne | 34 Kenmare Way<br>Rehoboth Beach, DE 19971<br>(302)-227-6405 | Factual testimony |
| Juanita Cox | Computer Associates International, Inc.<br>100 Staples Drive<br>Framingham, MA 01702 | Factual testimony |
| | | |
| | | |
| | | |
| | | |

**Plaintiff's Exhibit List.**

Exhibits in addition to those that the Defendant will produce are listed below.

| DOCUMENT | DATE | SUBJECT |
|---|---|---|
| Various Email Correspondence from Peter Bordonaro | April-August 2002 | National Grid |
| Various Email Correspondence from Jennifer Pilato | April-August 2002 | National Grid |
| Various Email Correspondence from Jonathan Botter | April-July 2002 | National Grid |
| Various Email Correspondence from Daniel Tunnell | April-July 2002 | National Grid |
| Various Email Correspondence from John Bohne | April-August 2002 | National Grid |
| Various Emil Correspondence from Kim Livolsi | April- July 2002 | National Grid |
| Various email Correspondence from John Bohne | June –November 1999 | Starwood Hotels |
| Various emails Correspondence from Joseph Flynn | November 1999 | Starwood Hotels |
| Various Email Correspondence from John Bohne | December 2001 | National Life |
| Various Email Correspondence from Donald Hoffman | December 2001 | National Life |
| Commission Calculation Spread Sheet | October 2005 | Actual computation of commissions due for National Grid |

  Reference will also be made to various exhibits produced during the Plaintiff's Correction of Material Facts...." These have been filed with the Court. The Plaintiff also reserves the right to produce electronic copies of the documents (Email and attachments) as may be appropriate. The Defendant is in possession of all of these documents.

10

**Additional Damages sought by the Plaintiff:**

The Plaintiff seeks as additional damages the following sums:

1. Compound interest at the Prime Rate of interest published effective the date of the award, for all monies due to the Plaintiff

2. Reasonable reimbursement of all expenses related to this action.

3. Damages equal to the award for "Defamation of Character, emotional distress, and Financial losses" resulting from the Actions of the Defendant.

4. Damages equal to the award for "Breach of Contract".

Respectfully Submitted

John P. Bohne
34 Kenmare Way
Rehoboth Beach, DE 19971
(302) 227-6405
(302) 448-0993 (mobile)

Dated This Day: Oct 24, 2005

To:

Brigitte M. Duffy, Esq.
Seyfarth Shaw
Two Seaport Lane, Suite 300
Boston, MA 02210

### CERTIFICATION

I herby certify that the foregoing Reply was served upon Defendant's counsel of record above, this day Oct 24, 2005 via United States Postal Service Express Mail and Email.

11